GEORGE W. CRAWFORD, Appellant, v. KANSAS CITY STOCK YARDS COMPANY.

Division One, December 23, 1908.

1. NEW TRIAL: Grounds Assigned: Other Grounds: Burden on Respondent. Although the grounds assigned by the trial court for sustaining defendant's motion for a new trial did not justify the order, yet if the record shows there was error committed in the course of the trial, not so specified, that did justify it, the action of the court in granting a new trial will be upheld on appeal. But the burden is on respondent to discover and point out such other error.

2. ———: ———: No Evidence: Insufficient Evidence: Contradictory. An assignment for a new trial that there was no evidence to sustain the verdict and defendant's demurrer to the evidence should have been sustained, and another assignment that there was some evidence but it was not sufficient and was outweighed by other evidence to the contrary, are contradictory.

3. ———: ———: ———: ———: Consideration on Appeal. Where there is some evidence to support the verdict, but the trial judge is satisfied that it is so suspicious in its character or so trivial in its weight that justice would cry out against a judgment founded upon it, he should set the verdict aside and let another jury pass upon it, and if in doing so he says the weight of the evidence was not sufficient to sustain the verdict, the appellate court will not review his action in granting a new trial on that ground, but will sustain his order. But if,

in the opinion of the trial judge there was no evidence at all, there was nothing for him to weigh, and if he assigns that as a ground for granting a new trial his ruling on that point will be reviewed on appeal. And where the trial judge says as his grounds for granting the new trial that there was no evidence and that the evidence was insufficient, the appellate court will consider the case as if only the one ground, that there was no evidence, was meant.

4. **NEGLIGENCE: Stockyards: Open Gate.** A stockyards company which has constructed a platform with cross gates, for guiding cattle as they are unloaded from the cars into pens, is not liable to an attendant of the cattle who while riding on the car is struck by an open gate, for any negligence committed by the railroad company in the management of the train. If liable to him at all, it is for having the gate open while the train was passing.

5. ———: ———: ———: **Custom.** It is dangerous, unnecessary and unusual to leave a gate open while the train is running, the gates forming the chute for the cattle from the car in which they are being shipped to the pens. But the stockyards company is not liable to an attendant of the cattle riding on one of the cars in the performance of his duties who is struck by the open gate, unless the company had cause to anticipate that someone was liable to be doing what the attendant was doing at the time he came in contact with the open gate. But if it was the custom for men on the company's premises doing business with it and using the appliances furnished by it, for the purposes of that business, to do what the attendant was doing at the time of the accident, the company is presumed to know that custom and cannot avoid liability by denying such knowledge.

6. ———: ———: ———: ———: **Inference: Anticipating Danger.** Although plaintiff, a stock attendant, was injured while attempting to leave a moving car in which were cattle he cared for, by coming in contact with the stockyard company's gate which was open and extended across the platform to within a few inches of the moving car, and although none of the witnesses testified that he ever saw a stock attendant climbing down the car ladder in the stockyards, yet if there was undisputed evidence that stock attendants were frequently seen upon and in the cars while in the yards, and moving about from car to car caring for the cattle, and that the cattle required the attendant's attention, it became the attendant's duty to care for them and if necessary to enter the car by the use of the appliances provided for entrance, and it became the stockyard company's duty to anticipate that, having attended to the cattle in one car, the attendant would in going to another car use the ladder and handhook and other usual appliances for exit, and

to anticipate that if he did so he would come in contact with the open gate.

7. ——————: Pleading and Proof: Material Variance: Location of Ladder. The variance between the pleading and proof must be material in order to work a reversal. Where the negligence charged was that defendant stockyards company was negligent in leaving open the gates to its pens while the train was yet moving, and the petition alleges that the cattle attendant "was in the act of coming down on the side of the car at the bottom of the ladder thereof" when he struck the gate, and his proof shows the ladder was at the end of the car, but also shows that he had come down the ladder, his right hand and right foot still on the ladder, that his left hand extended around to the hook on the side of the car and his left foot extended around to and rested on the sill of the car, there is no material variance between the pleading and proof.

8. ——————: Stockyards: Stock Attendant: Contributory Negligence: Not Seeing Open Gate. If the stock attendant, before entering the moving cars to attend to the cattle, saw that the gates to the stock pens were open and that they extended up close to the railroad track, he was guilty of negligence if he did not take care to avoid coming in contact with a gate as he left the car. But he was not negligent if he did not look to see if they were open. As a general rule a man is not required to look for danger when he has no cause to anticipate danger or when danger does not exist except it be caused by the negligence of another; and, unless there are exceptional circumstances for anticipating danger and therefore for looking, the general rule applies; and where the gates were not usually open while the cars were moving and there was no positive evidence that they were open when he had opportunity to look, the circumstances were not exceptional, and he cannot be charged with contributory negligence for not looking.

9. ——————: ——————: ——————: Contract Between Shipper and Railroad Company. Where the stock attendant sues a stockyards company for negligence in opening the gates which formed a chute across the platform for the cattle to the stock pens, while the train was still moving, and as a result thereof he came in contact with the gate as he was leaving a car to get on the platform, a contract between the attendant's employer, the shipper of the stock, and the railroad company, to the effect that the attendant was to ride in the caboose and not on any freight car while the train was in motion or switching, and if he did so he was to assume the risk, is of no importance as a defense to the stockyards company, and is entirely out of place in the case, for three reasons: first, defendant was not a party to the contract and had no interest in it; second, the evidence showed that, in spite of that clause in the contract,

which was the usual one, it was, with the knowledge and consent of conductors of trains, habitually disregarded and necessarily so because cattle often needed attention while the train was in motion; and, third, the caboose had been left at the last station by the railroad management, and the attendant was required to take passage on the cattle car or a street car, in order to care for the cattle as they came into the stockyards.

10. ——————: ——————: ——————: **Customary Duties.** It was not error to permit plaintiff, a stock attendant, to introduce evidence tending to prove the custom of those attending the cattle to go over the trains and into the cars to look after the cattle while the train was in motion. It is always a question whether a plaintiff who charges his injuries to defendant's negligence was at the time of the accident doing what was in the line of his well-known duty and doing it in the ordinary way.

11. ——————: ——————: ——————: ——————: **In Disregard of Shipping Contract.** And where defendant seeks, by introducing a shipping contract between the attendant's employer and the railroad company, to show that the attendant had no right to go into the car while the train was in motion, plaintiff may prove the custom of said attendants to go over and into the cars while the train was in motion with the knowledge and consent of the conductors. Otherwise, such evidence would not be competent for the purpose of proving a custom of disregarding the contract. But the contract itself was incompetent, and should have been excluded. But having been admitted no error was committed in permitting plaintiff to show that it had been habitually disregarded with the knowledge and consent of the conductors, who, in the management of their trains while on the road, are *pro hac vice* the corporation.

12. ——————: **Instruction: Leaving Gate Open: By Whom: Proof.** The instruction is not erroneous in assuming that the defendant's gate which was the cause of plaintiff's injuries was left open by defendant's employees, where there is no evidence that they left it open. If the gate was open, and in defendant's keeping, it did not devolve upon plaintiff to show who opened it.

13. ——————: ——————: ——————: **In Immediate Peril.** If in the usual course of the business of receiving and unloading cattle from cars the defendant stockyards company had reason to know that stockmen were liable to be climbing in and out of cattle cars moving along the side of the platform provided for their exit, and liable to be knocked off by an open gate, then it had no right to place its gates in a position where they were liable to strike a stockman so acting, even though there was no man in immediate sight in such peril. Defendant's duty to keep the gates closed did not begin only when such stockman was seen to be in danger.

14. ———: **Stockyards: Open Gates.** It is the duty of a stock-yards company to keep closed the gates by which a chute is made from the pens to the cars, while the cattle trains are moving in front of them, where stock attendants customarily move about over or go into the cars to care for the cattle while the cars are moving.

15. ———: ———: ———: **License: Wilful Injury.** It is not the law that if plaintiff went upon defendant's premises in the performance of his duty without any special invitation from defendant, he was a mere licensee and defendant owed him no duty except not to willfully injure him. Having opened its place of business for the purchase of cattle in charge of plaintiff, defendant owed him the duty of exercising ordinary care to place its premises in a reasonably safe condition, and its liability is not limited to wilful injury.

Appeal from Jackson Circuit Court.—*Hon. Jas. H. Slover*, Judge.

REVERSED AND REMANDED (*with directions*).

*Botsford, Deatherage & Young* for appellant.

(1) The verdict of the jury is conclusive that there was no contributory negligence on the part of plaintiff. That finding is abundantly supported by the evidence. Railroad v. White, 67 Fed. 481; Young v. Waters-Pierce Oil Co., 185 Mo. 666; Railroad v. Gee, 92 Fed. 318; Murphey v. Railroad, 115 Mo. 125; Railroad v. Nichols, 85 Fed. 945; Carpenter v. Railroad, 56 Fed. 451; Railroad v. Allen, 88 Pac. 966; Whipple v. Railroad, 35 Atl. 305. The uncontradicted evidence shows that the gates used by the stockyards company were usually kept closed when cars were passing, and that they were only opened, properly, when the cars had stopped in front of the pens, and when the opening of the gates and putting them up close to the cars were necessary in order to make a chute for the passage of the cattle from the car to the pens. The testimony shows that plaintiff was in the line of his duty in going into the car as he did and getting the cattle up, and coming out as he did, and being

on the ladder at the time he was hurt. The fact that plaintiff and other stockmen in coming into Kansas City as he did usually rode on a street car from Argentine into the stockyards, does not have any influence upon the legal question in this case. The undisputed evidence is that the Santa Fe Company left the cabooses of these stock trains at Argentine. (2) The uncontradicted proof shows that plaintiff was injured by defendant's gate, in charge of defendant's employees, extending out at and before the time plaintiff was injured in such dangerous proximity to the car on which plaintiff was engaged with his cattle, as to inflict injury upon him while in the necessary and proper discharge of his duty to his employer. This proof made out a prima-facie case of negligence on the part of defendant. The gate in question which injured plaintiff was owned by defendant and was under the management and control of its servants. The rule is a well-settled one that negligence may be infered when the thing causing the accident is under the management of the defendant or its servants, and the accident is such that in the ordinary course of matters it does not happen if those having the management use proper care. Hill v. Scott, 38 Mo. App. 374; Dougherty v. Railroad, 9 Mo. App. 484; Bevis v. Railroad, 26 Mo. App. 23; Minster v. Railroad, 53 Mo. App. 282; Dougherty v. Railroad, 81 Mo. 325; Gannon v. Laclede Gas Light Co., 145 Mo. 507; Rintoul v. Railroad, 17 Fed. 905; Trans. Co. v. Downer, 11 Wall. 129; Malloy v. Railroad, 173 Mo. 80. The authorities in support of the proposition in this case that it was the duty of defendant to plaintiff to keep defendant's tracks and adjacent platform owned and used by defendant for its profit free from such obstructions as would be liable to strike plaintiff while on a ladder as he was, in the proper discharge of his duty, are very numerous. Young v. Waters-Pierce Oil Co., 185 Mo. 634; Railroad v. Burton, 97 Ala. 240; Wilson v. Rail-

road, 7 Colo. 101; Ellison v. Railroad, 87 Ga. 692; Killian v. Railroad, 79 Ga. 234; Railroad v. Phinazee, 93 Ga. 488; Railroad v. Thompson, 101 Ga. 27; Railroad v. Frelka, 110 Ill. 498; Railroad v. Hopkins, 200 Ill. 122; Gates v. Railroad, 2 S. D. 422; McMarshal v. Railroad, 80 Iowa 757; Railroad v. Earle, 94 Ky. 368; Martin v. Railroad, 95 Ky. 612; Railroad v. Barnhart, 115 Ind. 400; Wolcott v. Railroad, 45 Minn. 368; Martin v. Iron Works, 31 Minn. 407; Nugent v. Railroad, 80 Maine 62.

*Pratt, Dana & Black* for respondent.

(1) (a) If defendant's motion for a new trial was properly sustained for any reason, whether that given by the trial court or any other which can be deduced from the record and which was set forth in the motion, then the order sustaining it must be affirmed here. Baughman v. Water Works, 58 Mo. App. 580; Hewitt v. Steele, 118 Mo. 473; Bank v. Wood, 124 Mo. 72; Stanard Co. v. Railroad, 122 Mo. 258; Kreis v. Railroad, 131 Mo. 540; Hoepper v. Hotel Co., 142 Mo. 378; Metropolitan Co. v. Webster, 193 Mo. 363; Stoner v. Royar, 200 Mo. 451. (b) This is so even when the trial court assigns wrong grounds for sustaining the motion. Thiele v. Railroad, 140 Mo. 335; Bank v. Armstrong, 92 Mo. 282; Ittner v. Hughes, 133 Mo. 679. (c) And the burden rests on appellant of showing that the trial court erred in granting a new trial; prima-facie that court exercised its discretion properly. Bank v. Armstrong, 92 Mo. 278; Hewitt v. Steele, 118 Mo. 473; Folding Bed Co. v. Railroad, 148 Mo. 478. (2) Even if the trial court erred in the first and second reasons assigned for granting a new trial, this court will not interfere with its action on the third ground, viz.: that the verdict was not supported by the evidence. Reid v. Ins. Co., 58 Mo. 430; Bank v. Armstrong, 92 Mo. 279; Lawson v. Mills, 130 Mo. 171. (3) But the court below did not err in assigning as

reasons for granting a new trial (1) that it should have sustained defendant's demurrer at the close of plaintiff's case, and (2) that it should have sustained defendant's demurrer at the close of the whole case; those reasons are abundantly supported by the record. (a) Because the allegations of the petition were not sustained by the testimony; nor did that testimony show that any negligence of defendant was the proximate cause of plaintiff's injuries. Chitty v. Railroad, 148 Mo. 74; Hesselbach v. St. Louis, 179 Mo. 524; Roddy v. Railroad, 104 Mo. 234; Winterbottom v. Wright, 10 Mees. & W. 109; Collins v. Seldon, L. R. 3 C. P. 495; Moore v. Railroad, 84 Mo. 486; Straub v. Soderer, 53 Mo. 42. (b) Because, further, plaintiff's own testimony plainly showed that his injuries were contributed to if not wholly caused by his own carelessness and disregard of his personal safety. Kelley v. Lawrence, 195 Mo. 87; Hurst v. Railroad, 163 Mo. 309; Hulit v. Railroad, 67 Mo. 239; Towner v. Railroad, 52 Mo. App. 648. (4) The record shows reasons (all set forth in defendant's motion for new trial) other than those assigned by the trial court for sustaining that motion, which were sufficient to have warranted the court's action, and for such reasons that action should be sustained under the authorities cited supra. (a) The trial court erred in admitting irrelevant and incompetent testimony. (b) Instruction 1 given at plaintiff's request was erroneous. (c) Instructions 5 and 6 given at plaintiff's request were erroneous. (d) The trial court erred in refusing defendant's instructions 3, 10, 11, 13 and 14. (e) The verdict was against the law as declared by the court to the jury.

VALLIANT, P. J.—This is an appeal from an order of the trial court sustaining a motion for a new trial. There was a verdict for the plaintiff for $5,000 damages for personal injuries which plaintiff alleged

were suffered by him on account of the negligence of the defendant. The grounds for sustaining the motion, as specified in the order, were two, first, the refusal of the court to give a peremptory instruction asked by the defendant at the close of the plaintiff's evidence and again at the close of all the evidence to the effect that the plaintiff was not entitled to recover; second, that the verdict was not supported by the evidence.

I. The first point made by respondent is that although grounds specified in an order sustaining a motion for a new trial may not justify the order, yet if the record in the case shows that there was error committed in the course of the trial, not so specified, that did justify it, the action of the court will be sustained.

That is a correct proposition, but in such case the burden is on the respondent to discover and point out to the appellate court such other error. [Millar v. Madison Car Co., 130 Mo. 517.] In apparent recognition of that obligation respondent has pointed out certain other rulings which he thinks justifies the order. Those rulings we will discuss later in the course of this opinion, but at this stage of the case we will consider the two grounds assigned as they relate to each other, to-wit: that the demurrer to the evidence should have been sustained, and that the verdict is not supported by the evidence. Those two grounds, if the second one means what respondent thinks it does, are contradictory of each other; the first signifies that there was no evidence at all tending to sustain the plaintiff's cause of action, the second as interpreted by respondent signifies that there was such evidence but that it was not sufficient or was outweighed by other evidence to the contrary. This court has often said that the granting of a new trial on the ground that the greater weight of the evidence was

against the verdict was a matter peculiarly within the province of the trial court and in a case fairly falling within that province the discretion of the trial court would not be reviewed. That is to say, we will not weigh the evidence pro and con to find on which side is the greater weight, because the trial court has done that and on that point we will defer to its judgment. And even if there is some testimony tending to sustain the plaintiff's case and therefore the trial judge should feel constrained to submit it to the jury and there be no evidence to the contrary, still, if the trial judge should be satisfied that the evidence is so suspicious in its character or so trivial in its weight that justice would cry out against a judgment founded on it, he would set the verdict aside and let another jury pass on the case. In such case the trial judge, in sustaining the motion for a new trial, would not say there was no evidence but would say the evidence was not sufficient to satisfy his conscience that a righteous judgment could be based on it. And in such case also if in the order granting a new trial, the trial court should say that the weight of the evidence was not sufficient to sustain the verdict, the appellate court would defer to the judgment of the trial court; but if that court should say that there was no evidence tending to prove the plaintiff's case the appellate court would review that judgment. The theory on which deference is paid to the judgment of the trial judge on the weight of the evidence is that he had a better opportunity than any one else to weigh the evidence and that he did weigh it. But if, in the opinion of the trial judge, there was no evidence at all, there was nothing for him to weigh and therefore he weighed nothing. How then can a court in one breath say there was no evidence at all and in the next breath say it weighed the evidence and found it lacking in credibility or ponderance? When we reflect on the difference, as viewed from the standpoint of the ap-

pellate court, between saying on the one hand there was no evidence and on the other that the evidence was not sufficient in weight or credibility, we see how unjust it would be to a party, a verdict in whose favor had been set aside, if the ruling of the trial court had really been based on its opinion that there was no evidence yet the ruling be sustained by the appellate court on the ground that it was based on evidence which the trial court reviewed and found deficient in weight or credibility. In that case, by a mere form of words the appellant would be deprived of his right to have the appellate court pass on the question of whether or not there was any evidence. The assigning of a reason for sustaining a motion for a new trial is not a mere form and a party should not be deprived of his right to have the appellate court review the ruling by the using of an incorrect form of expression. Here the court has said there was no evidence and that being its opinion there was nothing to weigh and nothing weighed. The specification in this case that the verdict was not sustained by the evidence was doubtless either intended to mean that there was no evidence tending to sustain it or else that form of expression was inadvertently used. We do not feel compelled in this case to defer to the ruling of the trial court on the theory that the court intended to say that it had weighed the evidence and had found that the preponderance was against the verdict, because the court had already said in effect that there was no evidence, therefore there was nothing to weigh. We conclude therefore that the motion for a new trial was sustained, so far as the specification in the order of the court shows, on the ground that the instruction in the nature of a demurrer to the evidence ought to have been sustained. That conclusion brings us to the consideration of the first question on the merits of the case to which we will now turn our attention.

II.  Was there any substantial evidence tending to sustain the plaintiff's cause of action?

Defendant owns a stockyards structure in Kansas City by means of which it carries on the business of receiving and caring for cattle that are shipped to that market.  In defendant's yards are railroad tracks to be used by the different railroad companies bringing cattle into the yards.  One of these is called track 3 and is the only one with which we have to do in this case.  This track is owned by the defendant stockyards company, but the cattle trains which are switched over it belong to and are operated by the railroad companies.  This track 3 runs north and south; along the east side of it runs a long platform about ten feet wide; east of the platform are pens designed to receive cattle as they are unloaded from the trains.  The platform is so constructed as to be on a level with the floor of the cars and extends from the pens to within about eight inches of the cars.  On the west side of the pens are gates opening into them, two gates to the pen.  When a car is to be unloaded it is stopped with its door opposite the gates of the pen into which the cattle are to be received, then the gates are opened, they swing out across the platform, extending to its outer edge, and forming an alleyway or chute through which the cattle are driven into the pen. When the gates are opened an iron rod is dropped at the end of each to hold it in place.  The eight-inch space between the floor of the car and the platform is covered, when cattle are being unloaded, by a narrow bridge.  When the cattle pass out from the car into the pen those gates are closed.  There were forty-two pens along the east side of this platform, each designed to be about the length of a car; they were numbered from 14 to 56 inclusive, beginning at the south end. The switch connecting track 3 with the track of the railroad company was a short distance south of the south end of the platform.  The train on which the

plaintiff was when he was struck and knocked off contained fifty-three cars, loaded with cattle and was backing in from the south end, going very slowly.

According to plaintiff's testimony he was on the platform watching for his cars, observing the cattle in the cars as they passed him, and when his cars came in view, seeing that some of the cattle of which he had charge had fallen down, he got into the car to help them up and while in the act of climbing out of the car was struck by one of the gates which was open, and was caught between the car and the edge of the platform, was rolled for a short distance and dropped to the ground, receiving some severe injuries. The petition alleges that the accident was caused by the negligence of the defendant in having the gate open then and there. The answer was a general denial and contributory negligence.

The plaintiff's testimony tended to show as follows: He was at this time and had been for several years engaged in the business of attending to cattle being shipped from Texas to the Kansas City market and to the defendant's stockyards. He was familiar with these stockyards and the manner of doing business. On this occasion he had come in attendance on a shipment of cattle, seven or ten carloads belonging to one Simpson who had hired him for this business. The shipment was from Pacos, Texas, to Kansas City, a journey which owing to some delay was about sixty hours. They were what were called sand cattle, which signified cattle raised in a sandy country with consequent soft feet, rendering them more liable than other cattle to fall down in the cars and become crushed or smothered. They have to be watched very carefully. "After you put that sort of cattle on the cars they become so tender-footed that it is almost impossible, unless a man stands right there, to keep them from dropping down, one on the other. . . . All these Texas sand cattle are about alike, very tender-

footed and they get very sore-footed in transit.   .   .   .
I have worked these same cattle to St. Louis and
never left my cars, but would go through one and
come back and find one dead that was not down when
I passed through a few minutes before.  They are so
tender-footed that when one falls down another will
get right across its neck.  They are liable to die within
a very few minutes.'' This train arrived at Argentine,
which is a short distance from the stockyards, about six
o'clock in the morning of December 7, 1902.  The
weather was very cold.  The caboose was detached at
Argentine and plaintiff had either to ride on the top
of one of the cars or else go in a street car for the
rest of the journey; he went in a street car, arrived
at or near the stockyards in time to get breakfast
before the arrival of the train, which was about nine
o'clock.  It was the custom of attendants in stock trains
to go from Argentine to the end of the journey in
street cars.  After having breakfast, the plaintiff went
to the stockyards to be present at the coming in of
his train and see to the delivery of the cattle of which
he had charge.  There was an elevated viaduct lead-
ing from the Stock Exchange Building across the stock-
yards and other tracks to track 3; a stairway came down
from this viaduct to the platform above described,
landing at or near gates 30-31, the stairway faced north
and a person coming down would naturally face in that
direction and would have seen the open gates if he
had looked and if they had been open at that time.
But the plaintiff testified that he did not look in that
direction; on the contrary he said that he was uneasy
about the cattle in his charge, because they had come
a long journey and for that reason were in bad con-
dition; that as he came down the stairway he placed
his hand on the railing and turned his face to the south
whence he was expecting his train and that, still fac-
ing in that direction, when he reached the platform
he turned south and walked towards the end of the.

platform which was about ten feet south of pen 14; there he saw the train coming, backing in on track 3; that as the train approached he squatted down on the platform to watch for the cars containing his cattle to see their condition. After a number of cars had passed, how many he did not know, his cars came in view. "And I don't know at all whether it was the first, second or third, but I really believe it was the first car as they came to me that I found the cattle all piled up, and the first thing I thought of was to go in and help them up." He got into the car as quickly as he could and helped the cattle up and then attempted to get out to the platform. The entrance to this car was through an opening about two and one-half feet square in the north end, and was reached by a ladder at that end. There was a hook on the side of the car on which one could take hold and swing his body around to a footing on the ladder. It was by use of this hook and ladder that plaintiff entered the car through that opening and he was attempting to return to the platform by the same means. He come down the ladder at the end of the car, had reached around to the side and had taken hold of the hook with his left hand, reached around with his left foot and rested it on the sill of the car, intending to swing his body around to face north, the direction in which the train was going, and thus step on the platform, but before he could accomplish his purpose he was struck by the gate, was rolled between the car and the platform and then dropped to the ground with severe injuries. It was at or near pen 30, 31, 32 or 33 that he was struck by the gate, plaintiff did not know which. Plaintiff's evidence also tended to show that it was the custom of men engaged in attending cattle on trains, not only at stations while the train was stopped, but also when moving, to watch the cattle to see if they should fall and to help them to rise when fallen and for this purpose they walked along the cars on top and when

necessary descended into them. This was the custom not only while on the road but while being switched into the stockyards.

The testimony on the part of defendant tended to prove that the gates were not open as plaintiff alleged and therefore he was not struck by a gate, and also that there was no such custom as plaintiff attempted to prove. Defendant also introduced in evidence the shipping contract between Simpson, the owner of the cattle, on the one side and the railroad company on the other, by which it was agreed that the attendant would "not get on or be on any freight car while switching is being done at stations or other places" and would assume all risks of doing otherwise.

We make this reference to the defendant's testimony because if it aids the plaintiff's case it is to be taken into account in considering a demurrer to the evidence.

Defendant was not liable for negligence if any committed by the railroad company in the management of the train; if liable at all it was for having the gate open while the train was passing. The open gate was a danger to one doing what the plaintiff was doing at the time he was struck and it was unnecessary and unusual to open it until the car had stopped at the pen designated to receive the cattle. The following cross-examination of the plaintiff by defendant's counsel, designed to bring out the fact that the plaintiff was familiar with the use and operation of the gates, shows that such was the custom: "You know how the gates were used? A. I did. Q. Do you know how long the gate had been open? A. I did not. Q. Do you know who left it open? A. I do not. Q. You know that when these cars are set up to a certain chute or pen, then they swing the gates around so as to make the chute leading up to the car door and letting the cattle out? A. Yes, sir. Q.

You know the gates were used that way? A. Yes, sir. Q. And when the gates were not in use they were swung around to one side? A. They are supposed to be. Q. They generally are? A. Yes, sir.'' Therefore we say that the leaving of the gate open while the train was running was dangerous, unnecessary and unusual. Still the defendant would not be liable unless it had cause to anticipate that some one was liable to be doing what the plaintiff was doing at the time of the accident. The defendant is presumed to know its own business and to know who are habitually involved in its operation. If therefore it was a custom for men on the defendant's premises doing business with defendant and using the appliances furnished by defendant for the purpose of that business, to do what the plaintiff was doing at the time of the accident, the defendant is presumed to know that custom and cannot avoid liability by denying such knowledge.

The testimony on the part of the plaintiff as to such a custom leaves the answer to the question rather to inference from the facts stated than to express evidence. None of the plaintiff's witnesses testified that he ever saw a stock attendant climbing down a ladder at the side of a car in the stockyards while the train was in motion and some of defendant's witnesses said they never saw one.

But the testimony for the plaintiff was to the effect that it was the duty of the stock attendants to be with their cattle all the time until they were delivered in the pens or chutes, that while in transit with train in motion and while switching in defendant's yards these attendants were frequently to be seen on the top of the cars and in the cars caring for their cattle. Defendant's witnesses said they had seen the stock attendants going over the tops of cars while switching in the stockyards.

It ought to require no testimony to establish the fact that it was the duty of men employed to attend to cattle to attend to them all the way. The fact that between the time the plaintiff left the train at Argentine and the time he saw it backing into the stockyards, a space of about three hours, he found several of his cattle down in a car, shows that they required his attention all the time. Counsel for defendant in their brief say that there was only one cow down, but the counsel are mistaken; the plaintiff testified that there were several down and one across another. But that is unimportant, because even if only one was down it was the plaintiff's duty to go to its relief. He testified that sometimes when the cattle were fallen they died in a few minutes. Defendant did not become responsible for proper care of the cattle until they had been delivered in its pens. If then, before the train stopped at the chute, the cattle were suffering for attention, whose duty was it to go to their relief? The fact that plaintiff had left the train at Argentine and had gone by street car to the stockyards is unimportant, we are not dealing with the consequence of that fact, we are considering what occurred at the stockyards. If it was his duty to go into the car to assist the fallen cattle he was not outside of his duty when, to do so, he used the ladder and the hook that was furnished for that purpose, and having assisted the cattle to rise, it was his duty to go, as he testified was his intention, to see if his cattle in the other cars were suffering; therefore in going in and coming out of the car and using the appliances provided for that purpose he was in the line of his duty and his right. That the stock attendants were frequently on top of the moving cars watching their cattle seems to be conceded, but it is insisted that there was no proof that in coming out of the car they were in the habit of descending the ladder on the side of the cars. If they had the right, and their duty called them, to

descend into the cars to assist fallen cattle and they habitually did so, is it not a natural inference and was it is not to be expected that when that duty was performed they would get out of the car by use of the appliances furnished? The evidence showed that cars equipped for ascent and descent to and from them as this was, were in common use then and there, therefore it was a thing appertaining to defendant's business and defendant is chargeable with knowledge of it. Defendant seems to draw a distinction between what might be expected of a brakeman and what might be expected of a cattle attendant. We do not see why there should be such a distinction drawn. If the defendant had reason to apprehend that a brakeman might be climbing down the side of the car as this man was, it was because it knew the brakeman's duty was liable to call him to do so, and so the stock attendant's duty was liable to call him to do so, the only difference between them is the purpose of the act of each.

Respondent makes the point that the petition says that plaintiff "was in the act of coming down on the side of the car at the bottom of the ladder thereof" whereas the plaintiff's testimony shows that the ladder was on the end of the car. The proof was that the ladder was on the end of the car, that plaintiff had come down the ladder, his right hand and right foot still on the ladder, his left hand extended around to the hook on the side of the car and his left foot extended around to and resting on the sill of the car. Perhaps the plaintiff's attitude could have been more accurately described in the petition than it was, but was the variance between the allegation and the proof material? The charge of negligence that the defendant was called to answer was that it left the gate open. Suppose other points being proven, the plaintiff's testimony had tended to show that the ladder was on the side as averred in the petition and he was

coming down it and the defendant's testimony was to the effect that the ladder was on the end of the car and that plaintiff's body was really at the corner of the car with one foot on the ladder at the end, and the other on the sill at the side of the car, and suppose the court at the request of the defendant had instructed the jury that if they believed from the evidence that the plaintiff was in the attitude last described when he was struck by the open gate the verdict should be for the defendant, what would be thought of that as a trial of right in a court of justice? Section 655, Revised Statutes 1899, says: "No variance between the allegation in the pleading and the proof shall be deemed material unless it has actually misled the adverse party to his prejudice, in maintaining his action or defense upon the merits." There was no such material variance here.

Our conclusion is that the defendant had reason to anticipate that a stock attendant was liable to be found doing just what the plaintiff was doing when the accident occurred and that it owed him the duty to keep its gates shut while the train was passing and failing to do so was guilty of negligence.

We come next to this question: Was the plaintiff so clearly guilty of negligence contributing to the accident as that the court should have taken the case from the jury?

The evidence shows that if the gates had been open when he was coming down the stairway he would have seen them if he had looked, and it also shows that he did not look, but that on the contrary he came down the stairway with his mind on the cattle, leaning over the railing with his face turned south. If the plaintiff saw the gates open he was guilty of negligence in not taking care to avoid coming into collision with them; but the testimony is that he did not see them. Was he negligent because he did not look in that direction as he came down the stairway?

As a general rule a man is not required to look for danger when he has no cause to anticipate danger or when danger does not exist except it be caused by the negligence of another. [1 Thompson on Neg., 181, 191; 7 Am. and Eng. Ency. Law. (2 Ed.), 391; Langan v. Railroad, 72 Mo. 392; O'Connor v. Railroad, 94 Mo. 150.] That is the general rule, and whilst there may be some exceptions yet there is nothing in this case to take it out of the general rule. There is nothing in the evidence to indicate that plaintiff had any reason to anticipate that these gates might be open. It was contrary to the usual course of operation, in those stockyards; nothing of the kind is shown to have ever occurred before, and it could occur only through the negligence of defendant, there being no suggestion that in this instance it did occur because of the unauthorized intermeddling of some third person. There was no duty therefore devolving on the plaintiff to look. But there is no positive evidence or strong inference that the gates were open when plaintiff came down the stairway. The evidence was that the opening and closing of the gates was an operation that required a very short time; therefore they might have been opened after the plaintiff had descended the stairway and turned to walk south on the platform. Besides all the defendant's testimony on that point tended to show that the gates were not open at any time before the accident.

The contract between the plaintiff's employer, Simpson, and the railroad company, which the defendant introduced in evidence and which was to the effect that the attendant was to ride in the caboose and not be on any freight car while the train was in motion or switching and if so he would assume the risk, is of no importance in this case. In the first place this defendant was not a party to that contract and had no interest in it, and besides the evidence showed that in spite of that clause in the shipping con-

tract, which was the usual one, it was, with the knowledge and consent of the conductors of the trains, habitually disregarded and necessarily so because the cattle often needed attention while the train was in motion, and again, the caboose was cut off at Argentine by the railroad management, and the attendant was required to take passage either on the cattle car or in a street car.

Our conclusion is that the evidence did not show such negligence on the part of the plaintiff as would have justified the court in taking the case from the jury by giving the peremptory instruction asked by defendant to the effect that the plaintiff was not entitled to recover.

III.   Respondent insists that the court was justified in granting the new trial on several grounds other than those specified in the order sustaining the motion as follows:

a.   Over the defendant's objection the plaintiff was allowed to introduce evidence tending to prove the custom of those attending the cattle to go over the train and into the cars to look after the cattle while the train was in motion on the road, or switching at stations with the knowledge and consent of the conductors.

The defendant was in the business of receiving and caring for cattle brought to that market.   It was shown that cattle coming to defendant's stockyards by railroad trains were usually in the care of an attendant who accompanied them on the journey and in the stockyards until they were delivered to the defendant. The question of whether the plaintiff at the time of the accident was doing what was in the line of his well-known duty and doing it in the ordinary way, was a question in the case.   It was therefore necessary to show to the jury the nature of the service the plaintiff was engaged to perform.   Was he employed to be a

mere listless attendant, to ride in the caboose and run no risk or perform no labor in the way of caring for the comfort and safety of the cattle? if so then he had no business climbing into this car to help the fallen cattle to rise, but if that was a part of his duty then the evidence was competent to show it. It is competent to show the duties of one in a particular employment by showing what men in like service usually do here, there and everywhere. To that extent the testimony was competent, but it seems to have been aimed also to prove a custom to disregard a clause in the shipping contract. In that light it would have been incompetent if the plaintiff had not been forced into offering it by the introduction of the shipping contract by defendant, which was designed to show that the plaintiff had no right to go into the car to assist the cattle while the train was moving. The introduction of that contract was error and it led the plaintiff, in self-defense, to show that although it was so nominated in the bond yet it was habitually disregarded. In the management of a particular train while it is on the road the conductor is *pro hac vice* the corporation, and if he thinks the condition of the cattle requires a waiving of that clause in the contract and knowingly permits the attendant to go into the freight car, he had the right to do it. But as we have already said, in the foregoing paragraph of this opinion, that contract has no place in this case. Respondent in its brief says that it was introduced only for "the purpose of showing the conditions upon which plaintiff was allowed to accompany the live stock and the warnings that were given him as to the dangers consequent thereon and as to things which he should not and could not safely do." Whatever danger there was incident to the employment the plaintiff assumed when he undertook it and no warning was necessary to charge him with that risk. But negligence of the defendant in connection with the business it was impliedly invit-

ing one of its customers to transact on its premises was not a danger incident to the plaintiff's employment. The plaintiff is not suing for damages for injuries received by him through a danger incident to the act of climbing in and out of a cattle car while the train was in motion, but for injuries received through the negligence of the defendant in leaving the gate open.

But whether or not the defendant's purpose in introducing the contract in evidence was the limited one mentioned, its effect on the minds of the jury was liable to be of farther range. It said in plain words that the plaintiff should not do what he was doing and that if he did so he assumed all risk and released the railroad company and every connecting carrier from all liability for injuries received by him. After that incompetent evidence had gone in the court did not err in allowing the plaintiff to prove that that clause in the contract was habitually disregarded or waived with the knowledge and consent of the conductors of trains engaged in that traffic.

*b.* Respondent complains of plaintiff's instruction numbered 1, for the reason that, after stating other facts necessary to be found, it contained this clause: "and that while going down the ladder on and swinging around said car plaintiff . . . was struck and knocked off said car by a gate of defendant, and the said gate had been negligently left open by defendant's employees," etc.

The first part of the complaint of that clause in the instruction is based on the supposed variance between the allegation in the petition and the proof on the point of the ladder being at the end instead of at the side of the car. What we have already said on that subject in the former paragraph expresses our opinion and we deem it unnecessary to say anything further on the subject. The latter part of the criticism

is based on the contention that there was no evidence tending to show that it was the defendant's employees who left the gate open. There was no express evidence as to who left the gate open. But if the gate was open as and when the plaintiff says it was, was it an unwarranted inference that it was left open by defendant or some of its employees? If the gate was open and plaintiff was hurt by it, did it devolve on him to prove who opened it? If so, then, in a case like this, there would be no remedy for the injury. The gate was in the keeping of the defendant and if it was left in a negligent manner and no testimony showing who did it the inference would naturally be that the keeper did it. There was no error in that instruction.

c. Instruction for plaintiff numbered 5 is as follows: "The court instructs the jury that in the admission of freight trains into defendant's yards for the discharge and delivery of cattle therein, it was the duty of defendant to stockmen who might be on said cars while moving and in transit on the railway tracks in the yards of defendant to exercise ordinary care to see that its gates were not left open and extended out to said cars, so that they might strike or cause injuries to such stockmen in the discharge of their duties while going up and down the ladders on said cars in the exercise of ordinary care thereon."

The objections urged against that instruction are first that there was no evidence "that any stockman ever went up and down a ladder on a car in a place where a gate could have struck him, there is no proof that plaintiff was hurt in that way." That is only a reiteration of the statement that there was no evidence tending to prove that stockmen in those yards were in the habit of going in and out of cars to attend to their cattle while the train was moving. We have already discussed that question, and also as to the manner in which the plaintiff was injured. The second

proposition is that defendant was not required to regulate the gates with reference to stockmen on a moving car, "no matter what their position might be, unless and until such stockmen were seen to be in a place of danger." If in the usual course of business the defendant had reason to know that stockmen were liable to be climbing in and out of cattle cars moving along the side of the platform and liable to be knocked off by an open gate, then it had no right to place its gates in position where they were likely to strike a man so acting, even though there was no man in immediate sight in such peril. We do not think the criticisms of that instruction are well founded.

The plaintiff's instruction 6 took up the subject of the above-mentioned shipping contract and told the jury that although the contract by its terms required the plaintiff to remain in the caboose in a safe place yet if for the purpose of looking after the cattle the stockmen habitually disregarded that clause with the knowledge and consent of the conductors, then that provision of the contract was no defense to plaintiff's action. We deem it unnecessary to say anything more on this point than we have already said. Under the circumstances it was not error to give that instruction.

*d.* "The trial court erred in refusing defendant's instructions III, X, XI, XIII, XIV."

Instruction III would tell the jury that "the duties of the plaintiff and defendant were not affected by any custom" and must not be considered in arriving at a verdict. That would have withdrawn from the jury the consideration not only of the custom of disregarding the shipping contract but also the evidence tending to show the custom of stockmen climbing in and out of the cars. The court did not err in refusing it.

Instruction X expressly declares that it was not the duty of defendant to keep its gates closed when

cattle were not being unloaded or when cattle trains were moving along their front. In other words the act of leaving the gate open was not negligence on the part of defendant. If that were the law then the court ought to have given the instruction in the nature of a demurrer to the evidence, since the only act of defendant that was complained of was the act which in that instruction the court was asked to declare was not negligence.

Instruction XI was to the effect that if the plaintiff as he was in the act of getting off of the car had looked he would have seen the gate but did not look, the verdict should be for the defendant. That also is equivalent to a peremptory instruction to find for the defendant, because the plaintiff testified that he did not look. But as we have already said in a previous paragraph of this opinion, in discussing the demurrer to the evidence, if he had no reason to anticipate that the gate might be open it was not negligence on his part to fail to look.

Instructions XIII and XIV are in effect that if plaintiff went on the defendant's premises to attend to his master's business without any special invitation from defendant he was a mere licensee and defendant owed him no duty except not to wilfully injure him. If that is the law then a business concern may open its doors to the public and thereby extend a general implied invitation to all who want to do business with it to come in and yet be under no obligation to observe any degree of care to see that the premises are in a reasonably safe condition, liable only for wilful injury. That is not the law.

Defendant complains of the court's modification of its instruction VII. The only modification of that instruction was that instead of saying that if the jury believed from the evidence that in getting off the car the plaintiff could have seen the gate, it said that if

by the exercise of ordinary care he could have seen the gate, etc. There was no error in that.

The defendant's last insistence is that the verdict was against the law as declared by the court. A discussion of that proposition would only lead us over the grounds over which we have already passed. There was no error in the trial which would justify the court in setting aside the verdict and granting a new trial.

The judgment is reversed and the cause remanded to the circuit court with directions to reinstate the motion for a new trial, overrule it, and enter judgment for the plaintiff on the verdict.

All concur.