BERTHA WILSON, Administratrix of Estate of LUTHER C. WILSON, v. MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—5 S. W. (2d) 19.

Division One, March 3, 1928.

*James F. Green, John B. Cole* and *Thomas J. Cole* for appellant.

Charles P. Noell for respondent; Glen Mohler of counsel.

RAGLAND, J.—Defendant was a common carrier of freight by railroad. Plaintiff's intestate, while in the employ of defendant as brakeman, and while employed in interstate commerce, lost his life

through its alleged negligence. This action is to recover the damages thereby sustained by his surviving wife and children.

The facts of the case are those which plaintiff's evidence tended to establish; the defendant on its part offered no countervailing evidence, but rested on its demurrer at the close of plaintiff's case in chief.

On the 28th day of December, 1923, employees of defendant were engaged at Leadanna, a station on one of its lines in this State, in moving a car loaded with coal from its main track to a siding, where they intended to set it opposite a coal bin. The shipment of coal had originated at a point in Illinois and would be at its destination when the car was "spotted" at the coal bin on the side track at Leadanna. The deceased, Luther Wilson, was a member of the crew so engaged. An engine and two cars were involved in the switching movement. The engine was moving backward pushing the two cars in a northerly direction. The car loaded with coal was on the north end. The height of this car from the bottom of the sill to the top was four feet. The coal came fully up to the top on all sides. On the east side, ten or twelve inches back from the north end, there was a ladder consisting of three hand-holds or grab-irons and a stirrup. The grab-irons were placed at equal distances apart, the top one being four inches below the top of the car. The stirrup was attached to the sill; just how far it dropped below the sill was not shown. Right around the corner, on the east side of the north end, there was another ladder consisting of grab-irons corresponding to those on the side, the top one being likewise four inches below the top of the car. The brake-staff was at that end of the car.

As the cars approached the switch connecting the side track with the main line, Wilson walked over the coal from the south towards the north end of the car. When he reached the point where the ladder went down on the east side he sat down on the side of the car. Presently he started climbing down the ladder. In his progress down he reached a point where he was standing with his left foot in the stirrup, holding the middle grab-iron with his left hand, and with his right foot swinging free, as though he were about to disengage himself from the ladder and step down on the ground. At this juncture he suddenly sprang up, putting his right foot around on the end sill of the car and throwing his right arm over the top end board of the bed. A portion of the board split off and he fell backward and was caught under the wheels of the moving car.

The top end board of the car was a pine board, twelve inches wide, two inches thick and extending across the entire width of the car. The ends were bolted to uprights. Wilson weighed about two hundred pounds. When he sprang up and grasped the board it split, and a strip off the top edge approximately three inches wide pulled away from the car at the east end; the west end because of a bolt through

it remained attached. An examination of the board which immediately followed Wilson's fall disclosed that there had been an old crack going through the entire thickness of the board and extending back about eighteen inches from the east end; but that the split from the old crack on to the west end of the board was a fresh break. The board was otherwise sound apparently; at least the evidence does not show the contrary. There was an old bolt hole in the end that pulled loose; but there was no corresponding hole in the upright at that point. This led witnesses who examined it to believe that the board had not been originally prepared for the car of which it then formed a part, but had been taken from a dismantled one. However, had a hole been bored in the upright to receive a bolt and a bolt inserted, all of which could have been done within thirty minutes, the splintered portion would probably have not pulled loose.

It is inferable from Wilson's actions and the attending circumstances that he climbled down the ladder to throw the switch, but that as he was about to step from the ladder to the ground he discovered some condition that required the setting of the brake, and that his purpose in attempting to spring up on the end of the car was to get to the brake wheel. There is no other conceivable reason for his doing as he did. It does not appear, however, that there was any emergency requiring hurried action.

Plaintiff interrogated several of her witnesses with respect to the custom and practice followed by a brakeman in Wilson's situation in getting to the brake wheel at the end of the car. Bowden, who had had considerable experience as car inspector and repair man in railroad yards, testified:

Direct Examination:

"Q. This place where you found this split, is that the place where brakemen usually grab in getting on the top of the car? A. Yes, I noticed in my experience that they take hold of the end of the car about as often as they do the hand-holds, if they have got occasion to cross over the cars."

. Cross-Examination:

"Q. When you say that you have seen them take hold of the end of the car, the wooden part, that is when they are crossing from one side of the car to the other? A. Yes, sir.

"Q. Walking along on this sill? A. Yes, sir.

"Q. And they merely put their hand on the top of the end of the car to steady themselves; you never saw a man grab hold of the top of the car around the end of it to pull himself up from the ground, did you? A. No, sir; just crossing over like I said, go from the side of the car across the end sill if he is going to cross over

to. the side of the car. . . : A brakeman or switchman engaged in switching this car in the yard down at Leadanna, if standing with one foot in the stirrup and one foot on the ground, wouldn't pull himself up on that car by catching hold of the top end of the car. He would only take hold of the top of the car to steady himself while he was walking along the end sill. They can't reach the top edge of the car from the ground. They have to get hold of the hand-hold to start with.''

And Scruggs, a conductor who had served an apprenticeship as brakeman, testified:

''Q. Now, assuming that a brakeman is desirous of setting a brake on a car and he is on the ground or one foot is on the ground and one foot is in the stirrup, what method would he use in getting to that brake there? A. Well, sir—

''Q. Loaded with coal, now. A. In my experience he would use his grab-iron to get up to the end sill and then he would walk across to the brake on the end sill, and steadying himself across by the top of the car.

''Q. Steadying himself by the top of the car? A. Yes, that is the way I have done myself.'' ..

All the witnesses who testified on the subject concurred in saying that the only purpose for which a brakeman customarily used the top of a coal car in the performance of his duties was to hold to it for the purpose of steadying himself in walking across on the sill at the end of the car. After repeated efforts, and by the use of leading questions, plaintiff's counsel succeeded in getting two or three witnesses to say that a brakeman in Wilson's situation, standing in the stirrup of the ladder on the side of the car, could not see the grab-iron on the end unless he leaned out and around the corner of the car; and that that was not regarded as safe. But no witness testified that he had ever seen a brakeman spring up on the end of a car as Wilson attempted to do.

The car from which Wilson fell was a foreign car. It had been received by defendant as a connecting carrier at Bismarck to be hauled from thence to its destination at Leadanna, a distance of about thirty miles. The date on which the car was received by defendant was not shown; but it does appear that at that time defendant had two car inspectors regularly employed in its yards at Bismarck. Bowden was defendant's car inspector at Poplar Bluff. He had had about twenty years' experience in inspecting cars. Defendant sent him to inspect the car involved in the catastrophe which caused Wilson's death the day following that occurrence. With respect to the examination he made and the conditions he found, he testified:

. ''The crack that was split in the top board was one that would not have been discovered by an ordinary inspection, because I couldn't

see it myself until I climbed around the car to examine it and the piece pulled off. Somebody had pushed it back in place after the accident. I passed around the end of the car on the ground and didn't discover it until I climbed up the corner of the car and took hold of it and it 'give' with me. The piece had been placed back in position and in its position I couldn't discover this crack by ordinarily, reasonably careful inspection.

"I also examined the condition of the grab-irons or hand-holds.
. . .

"I found that stirrup solid and in sound condition. I examined all the hand-holds above the stirrup and found them in good condition, safe, sound and solid. I examined those also on the end of the car and found them in good condition. . . . There was no bolt in that end that was pulled loose. I could discover that the bolt was missing by inspection. The bolt was not there 'because the bolt that holds the hand-hold on that end is supposed to bolt the board on, and it was bolted on through the hand-hold at the that end.' (The top hand-hold was attached immediately below the crack.) I couldn't see the crack until I got up and took hold of the board. I am familiar with the method of the Missouri Pacific in accepting cars from foreign carriers or other railroads; I have done quite a lot of interchange inspecting for them. . . .

"Q. In inspecting cars, just tell us what method is used with reference to how thoroughly it is done or what is done towards inspecting cars that are received from another line of railroad by the Missouri Pacific at that time? A. Why, you give the car a thorough inspection, if you are receiving a car in interchange, examine the wheel brakes, your sills, couplers, sill steps, brake shafts, running boards and hand-holds.

"Q. How about the boards of the car? A. The boards of the car, you examine it all, but then there is some of those defects that don't require a defect card, and you couldn't reject for that. Any defect that is so slight it don't require repairing before the car is let go, you can't ask for a defect card for that, much less turn the car down."

The foregoing is a summary of the evidence with respect to the controlling facts. No effort has been made to be accurate as to matters of local geography, locations, distances and directions, because unimportant.

The negligence counted on was pleaded as follows:

"Plaintiff states that the top timber or board at the end of the said car was not securely and properly bolted to the said car and was old, worn, weak, loose and defective, and that the defendant at the time of the injuries and death of deceased, Luther C. Wilson, was hauling and using the said defective car when they knew, or by the exercise of ordinary care could have known, of the defective condi-

tion of said car in time by the exercise of ordinary care to have remedied same and thereby have avoided the injuries which resulted in the death of the said Luther C. Wilson."

The negligence so alleged was put in issue by the answer.

There was judgment for plaintiff in the trial court, followed by this appeal on the part of the defendant.

Appellant assigns as error the refusal of the trial court to direct a verdict for it at the close of plaintiff's evidence.

The fact that the appellant was hauling a defective car and the further fact that its employee suffered injury are not of themselves sufficient to impose liability upon it under the Employer's Liability Act. There must have been negligence on its part. [Seaboard Air Line v. Horton, 233 U. S. 492, 501; Fish v. Railroad, 263 Mo. 106, 120, 172 S. W. 340.] To have been negligent it must have had knowledge, actual or constructive, of the defective condition of the car. The evidence fails to show that the appellant had actual knowledge; but it did have constructive knowledge of such conditions, and only such conditions, as an inspection made while in the exercise of ordinary care would have disclosed. [Gutridge v. Railroad, 94 Mo. 468, 474, 7 S. W. 476.] What kind of inspection is required to meet the test of ordinary care? In Gutridge v. Railroad, 105 Mo. 520, 526-7, and again in Near v. Railroad, 261 Mo. 80, 92, we said:

"We cannot formulate any rule of law fixing definitely the standard of ordinary care. Every attempt to do it has resulted in failure. What is ordinary care in one case, might be the grossest negligence in another. A mere glance at one hand-hold might indicate to an ordinary observer that it was safe, while, on the other hand, a glance might discover its defectiveness, and again the conditions might be such that ordinary prudence would suggest and require a careful scrutiny. We must not confound what the law requires and what ordinary prudence requires. In determining whether a master has been ordinarily prudent in the keeping of the appliances he has furnished his servants in repair, many circumstances must be considered. Their construction, the materials composing them, their age, *the uses to which they are put and the dangers attending their use,* with many other varying circumstances must all be taken into the account." (Italics ours.)

The evidence shows that appellant's inspectors in examining the different parts of a car kept in mind "the uses to which they were put and the dangers attending their use." They made very careful examinations of the hand-holds, stirrups, sills, couplers, brake-staff and wheels and running boards. But why should they have made a critical examination on the top end board of a coal car? There was no unusual strain put upon it; it was only necessary that it be sufficiently strong to retain the coal in the car and furnish sup-

port for a brakeman to use to steady himself as he walked along the end sill of the car. Bowden, the only expert plaintiff called to testify upon the subject, said that the crack in the board would not have been discovered by "an ordinarily, reasonably careful inspection." That plaintiff was not bound by this testimony, if the physical facts warranted a contrary inference, we concede. [Louisville Railroad Co. v. Thomas, 170 Ky. 145, 185 S. W. 840.] But they do not warrant such inference, when the purposes for which an inspection is made and which characterize it are considered. Certainly a railroad company in receiving and hauling a loaded foreign car for the purpose of continuing or completing a transportation is not bound at its peril to discover every cracked board or missing bolt, regardless of its location or use; if it finds and remedies all the defects from which an ordinarily prudent man would anticipate danger, it exercises ordinary care.

But if appellant had discovered the crack prior to Wilson's injury, its liability would not follow. The board was sufficiently strong to serve all the purposes for which it was intended, or ordinarily used. Injury from it could not have been foreseen or reasonably anticipated. "The doctrine is recognized in this State that where an injury cannot reasonably be anticipated and would not have happened unless under exceptional circumstances, it is not negligence to fail to take precautionary measures to prevent it, although if taken the injury would not have resulted." [Brightwell v. Lusk, 194 Mo. App. l. c. 649, 189 S. W. 413, citing: Brewing Assn. v. Talbot, 141 Mo. 674; Moore v. Lead Co., 125 Mo. App. l. c. 396; Monday v. Railroad, 136 Mo. App. 696; Foley v. McMahon, 114 Mo. App. 442.]

The evidence having wholly failed to show *negligence* on the part of the railroad company, the trial court should have directed a verdict for defendant as requested. The judgment is reversed. All concur.