JAMES E. SLATER, RESPONDENT, v. ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, APPELLANT.

Kansas City Court of Appeals.    January 6, 1930.

*Jacobs & Henderson* and *Thos. E. Deacy* for respondent.

*Cyrus Crane, Geo. J. Mersereau* and *Geo. O. Pratt* for appellant.

ARNOLD, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict in the sum of $12,500, but the court, believing it was excessive, required a *remittitur* in the sum of $8,-000. From a final judgment in the sum of $4,500 defendant has appealed.

The facts show that plaintiff was a railway mail clerk in the employ of the United States Government. He had for some years been working in mail cars owned by the defendant and operated by it between Kansas City and Tulsa, Oklahoma. A mail car would be set in a train at defendant's station at Tulsa about nine o'clock at night, plaintiff would begin his work in the car about 9:30 and the train would leave that place about 11:50 of the same evening.

The evidence shows that the doors to the mail cars were ususally closed and that the mail carriers would open the doors by hand, a slot in the lower part of the door being provided for that purpose. There was a rubber weather stripping where the door fit against the frame which sometimes caused the door to stick and when this occurred it was not always possible to open the door by use of the slot, and failing in this the mail clerks would climb up on the outside of the door and open it with their hands or feet. It was while plaintiff was trying to open the door to the mail car in question in the latter manner that he was injured by falling to the station platform.

The evidence shows that the doors to these mail cars were sliding affairs, running on rollers at the top and in a groove at the bottom. The door would open toward the front end of the car and to the

right of a person facing the car. The door was two feet six inches and a quarter wide and about six feet in height. There was a mail catching apparatus that went across the door space and on the outside of the door. This consisted of an iron rod running parallel to the ground and about three feet nine inches above the threshold .of the door. This rod near its left end was encircled by a short iron casting. At the bottom of this casting there was attached a hook or V-shaped arrangement to catch mail sacks while the train was in motion. This catching device was operated by a wooden handle attached to the upper side of the casting above and opposite to the V-shaped part of the apparatus. When the handle was pulled toward him down by a person stationed in the car the mail bag hook was caused to extend out away from the car in a horizontal position. When the catching device was not operating the V-shaped part of the catcher remained in a downward position along the side of the car and the handle above in an upward position. The rod that extended across the door acted as a pivot on which the casting, handle and hook operated.

The handle was twelve or fourteen inches in length and was fitted into an iron socket and the socket in turn was fitted on or was a part of the casting. This socket was two or three inches above the rod. When originally inserted into the socket the handle fit tight. The pocket was about two and a quarter inches deep and about an inch and three-eighths in diameter tapering down to an inch and a quarter. About an inch below the top of the socket, and on each side thereof, there was a hole drilled and the handle was fastened by screws inserted into these holes. The evidence shows that the weakest point of the handle was where the screws fitted into it. There was a space about four inches between the round rod and the door of the car. Between the casting and the left end of the rod there was a space of three or four inches on the rod which was encircled by a rubber bumper. There were two iron steps a short distance above the station platform and grab irons on each side of the door casing. These were provided for use by a man entering the door from the ground by stepping upon the steps and pulling himself up by means of the grab iron. The grab irons were of very little assistance to a man after he got upon the threshold of the door.

Plaintiff testified that he was injured about 9:30 P. M. of January 6, 1926; that he went to the door of the mail car in question and found the door shut and attempted to open it but was unable to do so. He then climbed on the threshold of the door by means of the steps and the grab irons and over the catcher with his hands. Placing his left hand on the rubber bumper he attempted to push the door open by the use of his right hand applied to the "opposite corner of the door."

"It didn't respond to that. I dropped my right arm down, which caught on this catcher handle. In that manner, standing on the left side of the doors, I raised my foot to catch in a portion of the panel of the door to push it open. About that time the handle broke loose and over-balanced me, broke off, and I fell to the platform below."

There was other evidence showing that plaintiff's efforts resulted in the door opening.

Plaintiff testified that he was not pulling on the handle and had very little weight against it when he fell. The handle was examined after plaintiff fell and it was found that it broke where the screws entered it and at that point it was rotten from one-third to three-fourths of its diameter. One of plaintiff's witnesses testified that "the wood was old and rotten." There was other evidence that these handles were painted when they were inserted in their sockets by the defendant; that on the handle in question the paint was worn on the upper end; that it had the appearance of being weather beaten; that is, we take it, the part that was without the socket. The evidence shows that the whole of this catching device was at all times exposed to the weather.

There was testimony that when the doors of these mail cars would stick that it was the custom of the mail clerks to get upon the threshold of the door, take hold of the catcher handle and open the door in that manner. This practice covered a period of twenty years prior to the time plaintiff fell. The evidence shows the car in question was regularly inspected after each trip by defendant at both terminals, Kansas City and Tulsa, and that no defect was found in the car as late as the afternoon of the evening of the day that plaintiff fell. It was further shown that the car had been in the shop at Topeka for a general inspection, overhauling, repairing and conditioning as late as September 19, 1925. However, the evidence shows that it was not the custom to remove the handle from its socket in making the inspection of the catcher device; that the inspection of this device consisted of looking at the part exposed to see if it was broken, decayed or defective in any way and putting the device through the motions of catching a mail sack; that these handles were never removed from their sockets for inspection and were not replaced at any time unless they were broken or split "or something like that;" that if the wood had rotted in the socket the inspection given the handle by the defendant would not disclose this condition.

Defendant's coach yards' foreman testified that these handles were exposed to the weather; that snow and rain would beat upon them which would have a tendency to rot them. However, as before stated, the evidence shows that when these handles were originally inserted they fit tight preventing water from running into the socket. This

car was built in 1910 and had been in service ever since that time. There was no testimony as to what time it would require for the handles to become loose in their sockets, excepting that defendant's general foreman in the passenger car department stated they would probably become loose in seventeen years and that there was very few handles that lasted that long.

Defendant insists that its demurrer to the evidence should have been sustained for the reason that there is no evidence tending to show that the handle was in a decayed condition where it broke. There was ample testimony to establish this fact. The handle introduced in evidence by the defendant and produced in this court by it was not the handle that broke, if plaintiff's witnesses are to be believed. Of course it was within the sphere of the jury to believe them.

A far more serious contention of the defendant is that the defect in the handle was a latent one and there is nothing to show that the defendant, by the exercise of ordinary care, could have discovered its defective condition. The case was tried upon the theory that the duty owed by defendant to plaintiff was that of ordinary care. However, we believe that defendant's liability was a question for the jury.

The evidence shows that the car in question was constructed sixteen or seventeen years before the handle broke. There is no evidence that the handle was ever replaced. The testimony shows that they were never replaced unless they were broken or split or showed from an inspection of that part of the handle exposed that they were not fit for further use. It is not necessary for us to pass upon the question as to whether from the testimony it may be reasonably inferred that this handle had been in place since the car was constructed. However, we think the evidence does show that the handle was an old one. It shows that the paint was worn off and that it was weather beaten. These conditions were obvious to one glancing at the handle without removing it from its socket. Of course, the extent of the decay discovered after the handle broke indicates that it had been in position a considerable length of time.

In the leading case of Gutridge v. Mo. Pac. R. R., 105 Mo. 520, the Supreme Court was considering the negligence of a defendant in not discovering a decayed condition of a wooden car upon which plaintiff was injured by reason of the giving way of a handhold which was attached to the car by means of screws. There was no evidence as to the appearance of the wood and the handhold before the latter came off. A latent defect was involved. In that case (l. c. 527) the court said:

"In determining whether a master has been ordinarily prudent in the keeping of the appliances he has furnished his servants in repair, many circumstances must be considered. Their construction,

the materials composing them, their age, the uses to which they are put and the dangers attending their use, with many other varying circumstances must all be taken into the account.''

In view of the fact that the defendant in the case at bar permitted the handhold to be used for a different purpose than that for which it was intended, that is, for the purpose of assisting mail clerks in opening the doors, and the fact that wood, as all men know, exposed to weather will in time shrink and will likely decay if coming in contract with moisture, at a place where it is not thoroughly exposed to the air where it will dry out, presents a state of facts for the consideration of the jury as to whether or not defendant should not have given the handle a more thorough inspection than the evidence shows that it did. It is not lack of inspection but lack of proper inspection that constitutes defendant's negligence in this case.

The case of Near v. Railroad, 261 Mo. 80, cited by defendant, is not in point. That case involved the breaking of an iron rod or brake used for the purpose for which it was intended. The question of the effect of the elements upon wood and the question of extraordinary use of the instrument was not involved. In the case of Wilson v. R. R. Co., 5 S. W. (2d) 19, cited by defendant, the board was sufficiently strong to serve all purposes for which it was intended and ordinarily used. Defendant was not required to anticipate the use which plaintiff was making of it at the time he was injured. In the case of Howard v. Railroad, 173 Mo. 524, the court held that the handle bar was not rotten but "a little brash." It was being used for the purpose for which it was intended at the time it broke.

We have examined the cases from other jurisdictions cited by the defendant and find them not in point and some of them at variance with the law applicable to facts of this kind, as laid down by our courts. [See Gutridge v. R. R., supra.] We think there is no question but that it was for the jury to say whether or not defendant made a proper inspection of the handle. [Gutridge v. R. R., supra; O'Flanagan v. R. R., 145 Mo. App. 276; Tallman v. Nelson, 141 Mo. App. 478; Ruch v. Pryor, 199 S. W. 750, 753; Anderson v. Lusk, 202 S. W. 304, 307; Siebert v. Liggett & Myers Tobacco Co., 273 S. W. 153, 155; Scheurer v. Rubber Co., 227 Mo. 347, 368.]

It is claimed the plaintiff did not show knowledge, either actual or constructive on the part of the defendant in time to have enabled it, in the exercise of ordinary care, to have repaired the defect. There is no merit in this contention. [Rhea v. R. R., 171 Mo. App. 160.]

It is further contended that there is no evidence tending to show that the handle would have broken if it had been used for the purpose for which it was intended and,

"There was no proof but that the handle might have broken under the use to which it was put, even though it had been new and placed in there that very day."

The question involved in this case is not whether the handle was sufficient for the purpose for which it was originally intended. It is a question as to whether it was sufficient for the purpose for which it was being used at the time of plaintiff's injury, the evidence showing that defendant permitted these handles to be used for that purpose over a long period of time. The evidence shows that they had been used for that purpose a great number of times and we infer that no one was injured by this use at those times. Therefore, the jury could have well found that it would not have broken if it had been new or reasonably new.

It is stated plaintiff was guilty of contributory negligence as a matter of law because "plaintiff voluntarily chose to use the appliance in a manner and way for which it was not .intended." In this connection defendant quotes extensively from the testimony of witnesses, both for plaintiff and defendant, showing conclusively that the mail catching device was not constructed for the purpose plaintiff was putting it to at the time he was injured, but for the purpose and use of catching mail sacks. However that may be, the evidence shows that it was the custom of twenty years standing for mail clerks to open sticking doors by the use of the handle and that these clerks opened the doors under such circumstances in the presence of station masters, inspectors and other agents and employees of the defendant and the practice continued uninterrupted. A custom of opening the door in this manner was fully established by plaintiff's testimony, six witnesses having testified to the custom. The evidence in relation to this custom was sufficient to meet every requirement laid down in the case of Shields v. Railway, 87 Mo. App. 637, and like cases cited by defendant. Consequently defendant owed these mail clerks the duty of using ordinary care to keep these handles in a reasonably safe condition for the purpose for which they were being used. [Loehring v. Constr. Co., 118 Mo. App. 163.]

In the case of Evans v. Explosives Co., 239 S. W. 487, 498, the court said:

"Contributory negligence may be rebutted by showing that the thing done was customary or was done in the customary manner, especially when it is shown that it was with the knowledge of the master."

The fact that defendant's witnesses testified that they had never seen the door opened in this way merely gives ground for conflict in the testimony and does not show that the custom was not uniform, certain and notorious. [See Crawford v. Stock Yards Co., 215 Mo. 394, 410-412.]

There was ample evidence to show constructive notice of this custom to the defendant, if not actual notice. Of course, constructive notice was all that was required. [Barry v. Ry. Co., 98 Mo. 62, 69; Finnigan v. Ry., 261 Mo. 481, 504.]

It is contended plaintiff had the choice of two ways to open the door, one safe and the other unsafe, and that he voluntarily chose the latter and he cannot recover. In this connection it is insisted that:

(1) "He attempted to open the door by taking hold of a small handle made of wood, the weakest thing in reach, when within his reach with the same hand he could have taken hold of an iron bar so firmly fastened to the car that it did withstand the shock and blunt of mail pouches coming against it with the train under full speed;

(2) "The car was equipped under the specifications of the Government, not only with a mail catching device, but with handholds at the side of the car firmly secured and fastened and within easy reach of plaintiff.

(3) "He could have called for assistance from Wickham, or asked him to hold him steady and keep him from falling while he was attempting to perform his acrobatic stunt in trying to open this door, or

(4) "He could have reported the condition of the sticking door to the inspectors and let them open it for him—this he chose not to do."

As to the first contention the evidence shows that it was not only convenient to take hold of the wooden handle in opening the door, but that it would have been very awkward to have attempted to open it in any other way. On cross-examination of plaintiff's witness, Evans, defendant brought out that to take hold of the iron bar or rod "it places you in an awkward position and you can't take hold of it at all." However, there is nothing to show that it would have been unsafe to have taken hold of the handle had it been in a reasonably safe condition and not rotten. Aside from this even though plaintiff had two ways of steadying himself, one by taking hold of the rod, which would have been safe, and the other by taking hold of the handle, which was not as safe, it would be a question for the jury as to whether or not plaintiff was guilty of contributory negligence. [Rhea v. R. R. Co., supra, l. c. 178, 179; Willadsen v. Creamery Co., 201 Mo. App. 527, 538; Turner v. Tyler Land & Lbr. Co., 188 Mo. App. 481; Boehm v. General Elec. Co., 179 Mo. App. 663.]

As to the second contention under this head the evidence shows that the handholds or grab irons at the side of the car could not well have been used by a person upon the threshold while opening the door; that these grab irons were below the place where one would

be required to take hold and were for the purpose of assisting one into the car from the ground.

As to the third contention the evidence shows that Wickham, another mail clerk, was with plaintiff at the time he fell. But plaintiff could hardly be convicted of contributory negligence as a matter of law in not calling upon Wickham for assistance, when such doors had been constantly and for a long time opened the way plaintiff was attempting to open this one without injury to anyone.

As to the last contention that plaintiff should have reported the condition of the sticking door to the inspectors and let them open it for him, the evidence shows that there were inspectors on defendant's premises whom plaintiff could have procured to open the door. However, plaintiff testified that he did not see any inspectors about when he got upon the threshold of the door, but he did not go and look for them. He did, however, say if he had seen one there he would have told him about the door being caught.

While there was much evidence tending to show that it was the duty of the clerks to report the condition when the door was not working properly, and that it was not the duty of the clerks to remedy the situation, plaintiff testified that Wickham was the clerk in charge of this car; that he was working under Wickham and that it was the duty of Wickham to make the report. However, there was evidence tending to show that it was not necessary to repair a sticking door. This was testified to by defendant's witness Webb, who stated; "that particular door wasn't necessary to repair, it is just a rubber weather strip which is usually what causes the sticking."

One of the witnesses testified that they were supposed to report a defect in the door "if it is bad enough." While the evidence shows that a defect in a door should be reported, it was not always done. Assuming that it was the duty of the mail clerks to report a defect in a door and that it was the rule that they were not to open a door until the defect was remedied, and that there was an inspector on the premises at the time plaintiff was injured to whom he could have reported the door and had the inspector open it, yet, we do not think plaintiff was guilty of contributory negligence as a matter of law in attempting to open it himself, in view of the fact that the evidence shows that the sticking door was not such a defect that it required repairing, and that a condition of the door in regard to the difficulty in opening and closing it was not reported unless it was bad enough. There was evidence that sometimes the wheels of the door would get off the track, so the sticking of the door was not the only difficulty encountered when a clerk would go to open it. It would appear that a sticking door was a trifling defect, one that was constantly ignored by the clerks themselves. In West v. Bayfield Mill Co., 149 Wis. 145, 150, it was said that it is not always

necessary for an employee to report that machinery is out of repair; that

"The question (of repairing) may depend on numerous considerations, such as the character of the defect, whether it be serious or trifling, the apparent imminence of danger therefrom; the duties of the employees in other directions, etc. It is evident that no unbending rule of this nature can be laid down."

It would hardly be expected of a mail clerk that he would go and hunt up an inspector every time such a trifling incident as a sticking door arose.

It is claimed plaintiff's instruction No. 1 is erroneous, in that in one part it lays down the rule that defendant was under the duty to use ordinary care to discover the condition and remedy it—that is, as defendant claims, it required the furnishing of a handle sufficient for the purposes for which the mail catching device was originally constructed, and in another part it required the furnishing of a handle sufficient for the purpose for which the mail clerks used it. For these reasons it is claimed that the instruction is misleading. There is no merit in this contention.

It is contended the verdict was so excessive as to show passion and prejudice on the part of the jury; that the judgment as it now stands is still excessive. Taking the latter contention first, we do not think a recovery of $4,500 is excessive under the facts. The evidence shows that plaintiff sustained a fracture of the surgical neck of the left humerus. A physician examining him on May 3, 1926, stated that when he had plaintiff move his left arm he "found that the scapula, the shoulder blade, was more or less fixed to the humerus, and all motions at the left shoulder were limited except the forward motion of the arm. The measurements of the arm as compared with the right arm, he being a right-handed man, showed about half inch difference in the circumference of his limb, as compared with the normal right limb. There was some swelling of the dorsum of the hand, the back of the hand, and there was limitation of motions, particularly the gripping motions of the left hand. The motions of the elbow, however, were free. There was no trouble in the elbow."

The witness further testified that he made another examination of the plaintiff the day before the trial and

"Practically the same findings were present as on the former occasion with the exception that the limitation of motion in his left shoulder region was less than it was at the first examination.

"Q. Did he complain of pain in reference to the motion of the arm? A. Yes, sir.

"Q. Doctor, I will ask you to state whether or not in your opinion this condition of limited motion of this arm is temporary or permanent? A. In my opinion it is permanent."

. . . . . .

The witness further testified:

"He can get his arm out to about a right angle. Beyond this point he cannot bring it up in order to get to the back of his neck or head. The forward movements of the arm are like I detailed in my first examination. They are practically normal. He can get his arm forward all right. . . .

"The shoulder blade rotates with his arm, which it does not normally. If you get the shoulder blade and big arm bone fixed together by injury or disease then that shoulder blade rotates with the motion of the arm. . . .

"In my opinion I think he will get some little motion yet that he has not recovered but that he would get full recovery I don't believe.

"Q. By that you mean there will be some improvement? A. Yes, sir; . . .

"The extent of the limitation in motion in the shoulder girdle and the gripping power of his left hand. I would judge seventy-five per cent of the first examination of the left arm.

"Q. Yesterday what per cent would you say it was? A. About sixty-five.

. . . . . .

"There are not many adhesions of the bone, but adhesions of the soft part, tendons of the soft parts, tendons and leaders and muscles."

Another physician testified that he found the morning of the trial:

"That he (plaintiff) has fairly good motion in the arm, with some restrictions in the upward and outward extension. He brings it forward about as well as the other. He takes it backward and upward, along his spine, just about equal with his right arm. He is able to carry it upward in extension at about a little better than right angles with his body. I can take hold of the arm and push it on upwards still more before he suffers very much discomfort."

Another physician testified that he examined plaintiff in April, 1926, and found:

"The left arm at the upper part around the bone showed a slight enlargement as if there had been a fracture and he had impaired motion. It was hard to rotate the arm backward or move the arm forward or throw the shoulder back. It gives considerable pain to move the arm backward or upward either way."

The witness further testified that he examined plaintiff the day before the trial and found his condition "about the same . . . there was very little difference, if any." Well, he couldn't raise the arm up as high as he should or rotate it backward as far as he should be able to do."

Plaintiff testified that he was away from work sixty-three days; that his arm was in perfect condition before his injury, but since

"the arm is, I can't reach up high like I formerly did; I can't lift the weight that I did and I can't do as much work as I formerly did;" that the arm gives him pain; that in doing his work "I have to lay the sacks down at times for the fact that I can't hold them;" that he is now drawing the same pay he did before he was injured; that he received $68 from the Government for sixty-three days of lost time.

From the testimony the jury could find that the plaintiff received a permanent injury to his arm of a serious nature and we think a recovery of $4,500 is not excessive. The fact that the verdict was for $12,500 and was excessive in the of sum of $8,000, does not of itself alone, without showing any other error committed in the trial, established that the verdict was the result of passion and prejudice requiring the judgment to be reversed and the cause remanded. [Willitts v. C. B. &. Q. R. R., 221 S. W. 65, 66; Cook v. Globe Ptg. Co., 227 Mo. 475, 551.]

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.

## On Rehearing.

In the motion for rehearing and especially in the suggestions in support thereof, defendant stresses the point, among others, that this court erred in treating the case in the original opinion as a master and servant case. Other points raised in the motion were fully discussed and properly decided in the opinion, and no further discussion of them is needed. The point requiring our special attention is that the opinion treats the case as one of master and servant, governed by the rules of law applicable thereto. It is plaintiff's contention that the case was tried throughout as a master and servant case, and that in this appeal defendant has switched positions, which may not be permitted. Defendant insists the case was not tried *nisi* as a master and servant case, but we find to the contrary. In fact, defendant has recognized that this case is to be treated as a master and servant case throughout, and so treated it upon the original submission in this court and did not suggest anything to the contrary prior to its motion for a rehearing. In its original brief, defendant stated:

"Now the rule for which we are contending is fundamental in this—*the defendant occupies the same position, so far as its legal duty is concerned, as that of a master, and in that position it must be conceded that these fundamental rules govern:*

"(1) That the defendant was not an insurer of the safety of any of its appliances. (2) That the mere fact that the handle broke and the plaintiff fell and was injured does not in and of itself prove negligence. (3) That the defendant was only required to exercise ordinary care with respect to the instrument furnished when used

for the purpose for which it was intended. (4) That the servant cannot dictate to the master the kind and character of instrument that it shall use in the conduct of its business other than whatever it uses must be furnished and maintained in a reasonably safe condition by the exercise of ordinary care.''

There is nothing more firmly established in the law than that a party is bound in an appellate court by the theory on which he tried the case below. The original opinion recognizes the theory upon which both parties tried the case, namely, and it was the duty of defendant to exercise reasonable care to furnish plaintiff a reasonably safe car and safe appliances. We think the original opinion covers all points now contended for, and that, in following the theory upon which the cause was tried, it properly declares the law. We adhere to our former opinion affirming the judgment. *Bland, J.,* concurs; *Trimble, P. J.,* absent.