GEORGE W. CONARD v. BALTIMORE & OHIO RAILROAD COMPANY, a Corporation, Appellant.—133 S. W. (2d) 350.

Division Two, November 22, 1939.

*Kramer, Campbell, Costello & Wiechert* and *Fordyce, White, Mayne, Williams & Hartman* for appellant.

*Mason & Flynn* for respondent.

338

TIPTON, J.—In the Circuit Court of the City of St. Louis, the respondent recovered a judgment for personal injuries in the sum of $17,500 against the appellant for an alleged violation of the Federal Safety Appliance Act. From that judgment, the appellant has duly appealed to this Court.

The appellant, a corporation, owns and operates a railroad in Illinois and other states, and is engaged in interstate commerce as a common carrier. On April 30, 1931, respondent was employed by the appellant as a car inspector in its railroad yards in East St. Louis, Illinois, known as the Cone yards. The respondent received the injury in question while making the "C" inspection of train No. 88 which was due to leave about 7:30 P. M. that day, bound for Cincinnati, Ohio, and points east. A "C" inspection consists in examining the cars for any defects in the air brakes system after the train is made up and the air from the engine is turned on. This inspection is accomplished by walking along the side of the train and listening to find out if any air is escaping from the air brake line. Respondent carried with him a lantern, wrench, and rubber hose air coupler. As

he walked along making his inspection he heard air escaping between two cars. It was necessary for him to go between these cars to examine the air coupling. He was in the act of setting down his lantern when the coupling parted and the air pressure caused it to whip around with great violence and strike him on the side of the head, inflicting the injuries for which he sues. The coupling parted before he touched it and the evidence shows that it could not have come apart under pressure unless it was in some way defective. The injuries that the respondent received will be discussed later in this opinion.

Appellant, in its brief, says that the principal questions for determination are: "Did the petition on which the case was tried declare upon a violation of the Safety Appliance Acts? And was the evidence sufficient to make a submissible case on the proposition that a violation of the Safety Appliance Acts was the proximate cause of respondent's injury?" As the evidence closely followed the petition, a determination of the sufficiency of the evidence will answer the question of the sufficiency of the petition.

Appellant contends that "the provisions of the Safety Appliance Acts, with reference to power or train brakes, cannot be violated with a standing train. That the only way in which these provisions can be violated is by means of a moving train, or, in other words, to run a train without the specified percentage of cars, properly placed in the train, having their brakes used and operated by the engineer on the locomotive drawing the train."

Section One of the Act is as follows:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." [March 2, 1893, Section 1, Title 45 U. S. C. A.]

On March 2, 1903, the act was amended, making it unlawful to operate a train with less than 50 per cent of the cars without power brakes. This amendment also provides that the Interstate Commerce Commission, after a full hearing, can increase the minimum percentage of cars in trains required to be operated with power brakes. On June 2, 1910, the Interstate Commerce Commission increased the minimum number of cars to be equipped with power brakes to 85 per cent.

In the case of Brady v. Terminal Railroad Association, 303 U. S. 10, 82 L. Ed. 614, l. c. 618, the Supreme Court of the United States said:

340

"The statutory liability is not based upon the carrier's negligence. The duty imposed is an absolute one, and the carrier is not excused by any showing of care, however assiduous. [St. Louis, I. M. & S. Ry. Co. v. Taylor, 210 U. S. 281, 295, 52 L. Ed. 1061, 1068, 28 Sup. Ct. 616; Chicago, B. & Q. Railroad Co. v. United States, 220 U. S. 559, 570, 55 L. Ed. 582, 586, 31 Sup. Ct. 612; Louisville & N. Railroad Co. v. Layton, 243 U. S. 617, 620, 621, 61 L. Ed. 931, 933, 934, 37 Sup. Ct. 456; Great Northern Railroad Co. v. Otos, 239 U. S. 349, 60 L. Ed. 322, 36 Sup. Ct. 124, supra.] The breadth of the statutory requirements is shown by the fact that it embraces all locomotives, cars, and similar vehicles used on any railway that is a highway of interstate commerce and is not confined exclusively to vehicles engaged in such commerce. [Southern Railroad Co. v. United States, 222 U. S. 20, 56 L. Ed. 72, 32 Sup. Ct. 2, 3 N. C. C. A. 822.] Laying down this comprehensive rule as a matter of public policy, Congress has made no exception of those employed in inspecting cars. The statute has been liberally construed 'so as to give a right of recovery for every injury the proximate cause of which was a failure to comply with a requirement of the Act.' [Swinson v. Chicago, St. P. M. & O. Ry. Co., 294 U. S. 529, 531, 79 L. Ed. 1041, 1043, 55 Sup. Ct. 517, 96 A. L. R. 1136.] In Davis v. Wolfe, 263 U. S. 239, 243, 68 L. Ed. 284, 287, 44 Sup. Ct. 64, reviewing the earlier cases, the Court held that one can recover 'if the failure to comply with the requirements of the act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designed to furnish him protection.' "

To sustain its position that the train must be moving to bring the injury of respondent within the act, the appellant relies upon the following cases: United States v. Erie Railroad Co., 237 U. S. 402, 35 Sup. Ct. 621, 59 L. Ed. 1019; United States v. C., B. & Q. Ry. Co., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1923; Louisville & Jeffersonville Bridge Co. v. United States, 249 U. S. 534, 39 Sup. Ct. 355, 63 L. Ed. 757; United States v. Northern Pac. Railroad Co., 254 U. S. 251, 41 Sup. Ct. 101, 65 L. Ed. 249; New York Central Railroad Co. v. United States, 265 U. S. 41, 44 Sup. Ct. 436, 68 L. Ed. 892; United States v. Great Northern Railroad Co., 73 Fed. (2d) 736. All of the above cases were suits to recover penalties for violations of the Safety Appliance Act because the cars were being moved without the power brake systems connected with the locomotives. The question in each was whether the movement in question was a train movement or a mere switching or assembling of cars. These cases held that if it was a train movement, then it was within the act, but if the movement was merely a switching or assembling of the cars, then the act did not apply. These cases did not rule the question before us; however, in ruling the Northern

Pac. Railroad Co. case, supra (65 L. Ed. 249, l. c. 253), the Supreme Court of the United States said:

"But there is nothing in the act which limits the application of the provision here in question to operations on main line tracks. The requirement that train brakes shall be coupled so as to be under engine control is in terms (32 Stat. at L. 943, Chap. 976, Comp. Stat., sec. 8614, 8 Fed. Stat. Anno. (2 Ed.), p. 1188) applicable to 'all trains . . . used on any railroad engaged in interstate commerce.' It is admitted that this railroad is engaged in interstate commerce; and the cases cited show that transfer trains, like those here involved, are 'trains' within the meaning of the act. A moving locomotive with cars attached is without the provision of the act only when it is *not* a train; as where the operation is that of switching, classifying, and assembling cars within railroad yards for the purpose of making up trains. Congress has not imposed upon courts applying the act any duty to weigh the dangers incident to particular operations; and we have no occasion to consider the special dangers incident to operating trains under the conditions here presented."

Of course, the above quotation does use the words, "moving locomotive," but we think these words were used in connection with the peculiar facts of that case. From the above authorities, we come to the conclusion that if the train is the unit, then the provisions of the act apply, but if the car is the unit the act does not apply.

In the case at bar, the train was made up; the engine was attached to the cars. It was past time for the train to have departed. In fact, the train was being held in its place by brakes controlled from the locomotive. In other words, there was nothing to be done to the train except make this "C" inspection, which respondent was doing at the time he received his injuries. There is no doubt that the defective brake coupling was the proximate cause of respondent's injuries. As we see it, the power brakes were not only for the purpose of controlling the speed of the train, but were also used to hold the train stationary.

We think this case should be ruled by the case of Davis v. Wolfe, 263 U. S. 239, 68 L. Ed. 284, 44 Sup. Ct. 64, wherein the Supreme Court of the United States ruled that one could recover "if the failure to comply with the requirements of the act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designed to furnish him protection." As respondent was in the discharge of his duty while inspecting the brakes of this train and he was injured by a defective brake coupling, he is protected by the act.

From what we have said, we must conclude that there was substantial evidence to support the verdict of the jury.

■ The view we have taken in regard to the violations of the Safety Appliance Act eliminates all other questions raised by the appellant except its contention that the verdict is excessive, and on this point appellant relies upon the cases of Philibert v. Benjamin Ansehl Co., 342 Mo. 1239, 119 S. W. (2d) 797, and Lynch v. Baldwin et al., 117 S. W. (2d) 273. In the first case the verdict was approved for $16,000 and in the second case the verdict was approved for $12,000. There was no question of loss of wages in either of the cases. However, in the case at bar, the jury had a right to infer that the respondent lost $6500 in wages between the date of the injury and the date of the trial. At the time of his injury, respondent was about twenty-nine years of age, earning $1800 per year.

Respondent's testimony in regard to his injuries is as follows:

"I was knocked out from between the cars and taken to the hospital; that is all I know. I don't know who took me; I was taken in an ambulance. I would not say that I was conscious when I arrived at the hospital. I don't remember anything for approximately two hours or better after the accident. The first that I remember is when they put me to bed at the hospital. I had already been treated when they put me to bed. I had an injury to the left side of my head. It was a concussion or fracture; I know I had a hole in the side of my head. My head was cut. I was away from work the first time three days. They took me back on the job on the fourth day. My two brothers-in-law took me; I wasn't able to walk, and I made out my card and went back to bed. I reported for work the next day and I had two days off then. I was working five days a week in 1931. I had two days off. Then I went back and done about the same thing I did the first day, only I stayed longer. I finally got back on the job, where I was doing my regular work, or trying to. I stayed there approximately a year after the accident. During that year I never did get my strength back like I normally was; I had severe headaches continually and a dumb feeling in my head, arms, and a very sensitive spot on the left side of my head at that time and it didn't seem to improve and I was nervous. That nervousness showed itself in the way of a dumb feeling, and I still have it, and instead of getting better all of the conditions are getting worse; also it affected my hearing considerably, although I am now getting more used to it and can talk by watching people close better than I could at first. Before the accident my speech was not hesitant as it is now. I never had a headache in my life before the accident. My headaches now are constant; they never quit entirely. The top and down the left side of my head is affected. I have lost weight and am still losing weight. Two weeks ago I weighed 131 pounds. In 1930 and 1931 I weighed an average of 150, but generally around 160 to 175. Occasionally, when this nervousness gets at its worst, it feels like my insides is going to jump out on the outside, and oc-

casionally I have severe spells or attacks. This numbness is in my legs; well, to some extent, over my entire body. I can't sleep and my appetite isn't much, but I can't hardly get a night's sleep once a week, due to my head hurting so much and other conditions. At the time of my injury I was paid about $1800 a year by the railroad company. Since 1932 I wouldn't average five hundred to put it all together.''

The testimony of Dr. Hoge, a specialist in nervous diseases, in part, is as follows:

''After I got a history of the case I made an examination. I noted a scar across the left side of his head and face involving the auricle of the left ear; that is, the part of the ear that is outside of the head. In testing his deep reflexes, I found they were only moderate, hardly up to normal. I found that those reflex actions were of only moderate intensity, not up to the average. In having him stand on both feet with his eyes closed, his station was moderately steady, but not completely so, and in standing on one foot at a time, he was less steady on the left foot than he was on the right. If I had him bend forward and stand with his head somewhat, say, parallel with the floor and his eyes closed for a short time and asked him to raise quickly with his eyes open and then ask him what he felt, he said he felt dizzy. In having him extend the hands and fingers in this way (indicating), they were tremulous; and in asking him to show his tongue by putting it slightly out of the mouth, I noticed his tongue was also tremulous. I also note again that the deep reflexes in the right leg were somewhat stronger than those in the left. Sensation in the skin generally, the surface as tested by touch and point appeared normal except in a considerable area in front, back of and just above the right auricle; that is the right external ear; there he detected touch less distinctly than over other areas with a tendency to a tenderness also over these areas. The abdominal and cremasteric reflexes were present and definite. The hearing in both ears was diminished as compared with the average individual with good hearing in both ears, and was less good in the left ear than in the right. He talked slowly in a rather confused and hesitating manner; he has difficulty in collecting his ideas and stating them distinctly and clearly. He is not sure of dates; however, I noted he had an intelligent expression of countenance.''

Dr. Hoge testified also that there was evidence of concussion of the brain and that his injuries were permanent.

Dr. Meyers testified that the respondent had lost between fifty-five and sixty per cent of his hearing capacity.

In the case of Brady v. Terminal Railroad Assn. of St. Louis, 344 Mo. 502, 127 S. W. (2d) 1, we reviewed the recent verdicts approved by this Court. The verdict in the case at bar is in harmony with these rulings.

344.

Taking into consideration the earning power of respondent, we see no demonstrable reason for reducing the judgment; the same is therefore affirmed. All concur.