CARRIE MURRAY v. RALPH D'OENCH COMPANY ET AL., Defendants, RALPH D'OENCH COMPANY, Appellant.—147 S. W. (2d) 623.

Division One, February 14, 1941.

*J. D. Leritz* and *Merritt U. Hayden* for appellant; *John W. Giesecke* of counsel.

*Reardon & Lyng* and *John H. Martin* for respondent.

HYDE, C.—This is an action for damages for personal injuries, sustained as the result of a fall on a slick linoleum floor of a beauty parlor in a building under defendant's management. Plaintiff had a jury verdict for $10,000. From the judgment entered therein, defendant has appealed.

Defendant corporation was engaged in the building management business and had charge of renting, servicing and operating the building under a contract with the owner. The negligence charged and submitted was causing and permitting a dangerous and unsafe condition of the floor, failure to warn of the condition of the floor, and failing to remedy the condition of the floor. Defendant's answer was a general denial and a plea of contributory negligence. Defendant contends that plaintiff failed to make a jury case and that the court erred in refusing its peremptory instruction, in the nature of a demurrer to the evidence. Therefore, we will review the evidence and consider it from the viewpoint most favorable to plaintiff.

All of the testimony about the occurrence was by plaintiff's witnesses. Plaintiff's own testimony was, as follows:

"On October 26, 1937, I had an appointment for 9 o'clock at the Schaedler Beauty Parlor. I was right on time, within one minute either before or after. I was familiar with the premises, of course. . . . As I entered the waiting room Miss Schaedler and Mrs. Collins were standing over very near the door of the entrance into the operating room (also called the "work room") and the first thing that Miss Schaedler said to me as I stepped in, she says, 'Mrs. Murray, we are cleaning up a spot here,' and I said, 'Yes, all right.' . . . I took off my coat and hat and . . . went into the operating room. . . . It (the damp spot) was a little to the left of the door leading into the operating room—not in the center. It was not right in front of the door. It was a little to the left as I went in, which would be on the east side, but there was plenty room on the other side for me to walk in. . . . I could see there was something there. I didn't see anything on it because I didn't look close enough. . . . I was there having my hair shampooed anywhere from five to ten minutes. . . . Some one said, 'Mrs. Murray, you have a phone call.' I think it was Miss Schaedler. . . . I got up and turned a little around very near that door—the west end of that door, and took, I should say, perhaps just about two steps. It was very near. I fell immediately almost after I entered into this waiting room. . . . (Cross-examination) Q. Did she call your attention to the fact that she was cleaning up some spots? A. Yes, sir. . . . Q. And when she called your attention to that fact did she point out to you where that was located? A. Yes, sir; she was standing right

by it—right to the edge of it. Q. And you saw a wet spot there, did you? A. Well, I just glanced down. I thought it looked wet. Q. And you say it was about a foot and a half in diameter? A. I should say about that. It might have been a little wider. . . . Q. A little more than a foot from the door? A. Well, I didn't observe that so closely, but I know it was right behind a little place where they hang clothes there. (East from the offset in the wall, which made a vestibule or hallway between the two rooms.) . . . Q. Now, when Miss Schaedler pointed out the spot to you you walked into the work room and avoided that spot? A. Certainly. . . . Q. Did you observe (when called to the phone) whether or not it was still on the floor? A. I merely glanced as I always do—as anyone would normally—but I didn't notice anything. . . . Evidently I stepped two steps on the floor where it was clear because the minute I stepped on whatever it was, it was just like skating on ice and both my feet went in the air. Q. You don't know what you stepped on? A. No. . . . Q. Now, you say the light in the waiting room—was that dark in there? A. Yes, sir; it was very poor. . . . Q. You noticed the room was dark and dingy? A. Yes, sir. There were no windows there. Q. Now, the light as you entered the room, did that in any way interfere with your seeing the floor? A. Yes, sir; I think it would. I was in my own light coming out from the light room.'' (Plaintiff said there was ''a muddy color, dark dirty'' substance ''mottled'' over ''about fifteen inches or more'' of her dress after she fell.)

While plaintiff said that she never saw the janitor (employed by defendant) until after she fell, he testified that he ''was just fixing to start to rub'' to wipe up the spot in this hallway with his mop when plaintiff came in the waiting room; that she went by him into the work room; that she was called to answer the phone while he was mopping, that when she came through the doorway ''walking kind of fast'' he ''told her to take it easy and look out, it was wet;'' and that ''she slowed down and walked across.'' He said he was ''outside wringing out the mop'' when plaintiff went back into the work room after this first call, and that plaintiff fell, when she came out again after he had mopped a second time, and left the beauty parlor. Plaintiff denied that she went to the phone more than once. However, the tenant (beauty parlor operator) said that she went to answer the phone twice before the time she fell. Her assistant, Mrs. Collins, also •said that plaintiff answered the phone twice before she fell and that ''Miss Schaedler helped Mrs. Murray to the phone the second time.''

The janitor's account was that he had cleaned the beauty parlor soon after 8 o'clock that morning, ''emptied the waste baskets, swept the floor and mopped'' with clear water. He said that about the time he finished, Mrs. Collins came in and asked him to try to clean a stain on the linoleum floor. The linoleum had big black and white

squares and some of the white squares in the hallway were stained with black streaks. Mrs. Collins got some cleaning powder out of a cabinet in the work room (she said it was "Dutch Cleanser") and "sprinkled it on the floor" just inside the door between the work room and the hallway. She sprinkled it over an area about a foot and a half square but not "very thick." He smeared the powder around and rubbed it with his mop. He then went out into the outside hallway of the building and wrung his mop in the wringer on his mop bucket and rinsed it. When he came back to try to dry it up, Miss Schaedler, the operator of the beauty parlor, came in and told him to "get out of there with that mop." It was about 9 o'clock and customers began to come in at that time. Plaintiff was the first customer to arrive. He said that he had intended to rub it again with a dry mop. He also said that in rubbing the powder around and mopping it the second time he covered the entire hallway, but "it didn't extend beyond that vestibule." He also said that when he left the floor "could have been damp but it wasn't wet · . . . it was almost dry." He was in the outside hallway, after Miss Schaedler told him to leave, when he heard plaintiff fall and came back to help lift her. When he did so he saw heelmarks, about eighteen inches long, where she had slipped in the hallway at the place he had been mopping. He said that he had never seen the soap powder before, which Mrs. Collins used on the floor, and all of the evidence shows that he was furnished no cleaning powder and that his instructions were to mop all offices with only clear water.

Miss Schaedler's testimony was that the janitor was mopping the floor when she came in but she did not see any soap powder. She told him to stop mopping because she did not want him in there when the customers came in. Plaintiff (who was 72) had arrived about that time and Miss Schaedler said "Mrs. Collins and I walked in with her" and "I told her to be careful, that the janitor was mopping the floor." Mrs. Collins also said "we met her to cross the floor," and that "the floor was a little bit damp." Miss Schaedler said that she thought she called plaintiff to the phone the first time; that she did not remember who called her the second time; but that the third time plaintiff "went to the phone by herself." Plaintiff was being called about a club play. Miss Schaedler did not say anything to her about the floor after the first time.

The waiting room was about 8 feet by 12 feet. It had no windows. It was lighted by a ceiling light installed by the owner and a table lamp installed by the tenant, who furnished all light bulbs, paid for the current, and had full control of the lights. The work room was south of the waiting room, connected by the small hallway. It was about 10 feet by 26 feet. It was on the south side of the building and received light from the outside windows. Defendant's manager said that it was the duty of the janitor to attend to "any other small

duties (tenants) might ask the janitor to perform," as well as regular cleaning, and to do "anything within reason" they asked him to do as to extra small matters of service. Defendant did not furnish any floor coverings. Miss Schaedler had acquired the beauty shop from her sister, who had opened it originally.

It is contended that defendant is not liable because the janitor was not performing any service for defendant in what he did to clean the spots from the floor; but was acting solely under the direction of and for the tenant. Because of the view we take, it is unnecessary to rule this question. Regardless of which version of the circumstances we accept, plaintiff was informed that work of cleaning the floor was under way and knew there was a damp spot in the hallway between the work and the waiting room. We have held that "the true ground of liability (of an owner or occupant of lands to an invitee) is the proprietor's superior knowledge" of an unsafe condition and its dangers. [Stoll v. First National Bank, 345 Mo. 582, 134 S. W. (2d) 97.] We have, therefore, ruled, where the condition is so open and obvious that it is as apparent to the invitee as to the owner or where the condition is actually known to the invitee, that there is no liability; otherwise the proprietor would be in effect an insurer. [Stoll v. First National Bank, supra; Lindquist v. S. S. Kresge Co., 345 Mo. 849, 136 S. W. (2d) 303; State ex rel. Golloday v. Shain, 341 Mo. 889, 110 S. W. (2d) 719; Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S. W. (2d) 723; Paubel v. Hitz, 339 Mo. 274, 96 S. W. (2d) 369; Cash v. Sonken-Galamba Co., 322 Mo. 349, 17 S. W. (2d) 927; Vogt v. Wurmb, 318 Mo. 471, 300 S. W. 278; Mullen v. Sensenbrenner Merc. Co. (Mo.), 260 S. W. 982.] In accordance with these rulings, we said in Paubel v. Hitz, supra: "A warning imparting notice of the condition of the runway would have discharged defendant's legal obligation." Here we have a case where the warning was given. Plaintiff knew that this cleaning process had been attempted. Yet plaintiff said that, although in her own light in entering the hallway, she "merely glanced" at the floor when she went to the phone, and did not know what she stepped in. It is clear that plaintiff either forgot or disregarded the warning.

It is, however, argued that, at the time plaintiff was shown a spot at which McClung was working, "this spot was about eighteen inches in diameter, and had been sprinkled with soap powder, but was not wet. McClung, as yet, had not put his wet mop to it (which is taking the janitor's version instead of plaintiff's statement that 'it looked wet') and the spot did not cover the entire door through which plaintiff entered the work room of this beauty shop, but there was ample room for plaintiff to walk around this spot. . . . After plaintiff went into this work room, and before she came out to answer the telephone, McClung began to mop this spot, and to mix water with this soap or scouring powder. He enlarged this spot so

that it covered the entire doorway. . . . There was a change in the condition of the floor in that what had been pointed' out to her, and what was at the time she entered the work room safe, now had become slippery, dangerous and unsafe through the action of the appellant and its servant.'' But plaintiff, according to her own statement, was told that they ''were cleaning up a spot'' in the hallway. She saw the place where the cleaning was being done. The hallway was very little wider than the doorway. Everyone knows that water will not stay in one spot and that it necessarily will be spread around to some extent in rubbing a spot on a linoleum floor with a mop. According to plaintiff's version, they were not through with the cleaning work when she went into the work room. Surely she had some idea, from what she was told and what she saw, as to what the cleaning process would be. Such a cleaning operation is a so simple and generally understood process that everyone knows its means, methods, effects and results. Does reasonable care require any more than to give information that such a cleaning operation is under way and to point out the place where it is going on? We know of no case that would require more. Whether the defendant or the tenant be considered as the proprietor (after the tenant arrived, ordered and took charge of these cleaning operations) certainly neither was required to do more than to give notice to plaintiff that the cleaning process was going on in this hallway. Plaintiff's own testimony shows that duty was fully performed, when plaintiff entered, whether it was done by defendant's employee or the tenant. Surely it would be unreasonable to hold there was further duty upon a proprietor under such conditions and particularly upon defendant to repeat this notice and warning in ten minutes or less, especially after defendant's employee had been ordered by the tenant to ''get out.'' We, therefore, hold that there is no substantial evidence of negligence on the part of defendant, and that its peremptory instruction should have been given.

The judgment is reversed. *Bradley* and *Dalton*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.