LAUREL C. LARSON, Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Corporation, Appellant, No. 43350—261 S. W. (2d) 111.

Division Two, October 12, 1953.

*John H. Lathrop, Sam D. Parker, James F. Walsh* and *J. W. R. Headly* for appellant.

*Ben W. Swofford, Robert A. Schroeder* and *John C. Milholland* for respondents; *Swofford, Schroeder & Shankland* of counsel.

BARRETT, C.—Laurel C. Larson, a government postal clerk, was injured when a mail pouch struck him in the face as he picked up the pouch from·a fast moving passenger train with a mail catcher arm at Las Animas, Colorado. To recover damages for his resulting injuries he instituted this action against the Atchison, Topeka and Santa Fe Railway Company whose duty was to furnish the mail car and its appliances. The plaintiff's right to recover was submitted upon the hypothesis of a defective mail catcher appliance in that the horizontal bar across the doorway was bent downward. The specific negligence hypothesized with reference· to the appliance was that the railroad failed to exercise ordinary care to furnish the mail car with a reasonably safe catcher arm, failed to inspect, repair or remedy the defective appliance, and knew or should have known of its condition in time to have repaired or replaced it. The jury returned a verdict in favor of the plaintiff for $15,000. Upon the railroad's motion for a new trial, the trial court required a remittitur of $5000 and the railroad appeals from the final judgment of $10,000. It is first contended that the trial court should have directed a verdict for the railroad for the reasons, one; that the plaintiff failed to make a submissible case and, two, that the uncontradicted evidence revealed that the plaintiff was guilty of contributory negligence as a matter of law. It is also urged that the court erred in instructing the jury, and that the judgment of $10,000 is excessive.·

There was a five-man crew on the mail car and from Kansas City to Newton, Kansas, Mr. Dobbs handled "the local" to Newton and had the duty of dispatching and catching mail pouches. On the trip he made a single catch of mail at Strong City, Kansas. From Newton to La Junta, Colorado, Mr. Larson handled the local and made but one pickup of mail with the catcher arm at Las Animas, Colorado. It is his claim and testimony that as he made the catch at Las Animas the mail pouch came in the door and struck him in the face.· He does not claim that the entire pouch came inside the car door but that a part of the bag took the unusual course and flapped into the door rather than squarely into the catcher arm outside the door. When the

pouch struck Larson he staggered back into the car and another postal clerk took the pouch from the catcher arm. The catch was made, the pouch lodged in the crook or slot in the catcher arm, and the railroad, in contending that the plaintiff did not make a submissible case, points to the fact and urges that the plaintiff's testimony that the bent horizontal bar caused the pouch to fly in the door any farther than usual is contrary to the physical facts, inherently and manifestly unbelievable and does not constitute substantial probative evidence. Carner v. St. L.-S. F. Ry. Co., 338 Mo. 257, 89 S. W. (2) 947. It is said, since the pouch slid down the catcher arm into the slot, that the plaintiff was exposed to no greater hazard than usual and that there is no evidence that the alleged defect increased the danger that normally attends a catch of mail with a catcher arm. It is in this connection that the railroad contends that the court erred in giving instruction one. As indicated, the instruction hypothesizes ''a defective mail catcher appliance in that the horizontal bar thereof was bent downward'' and it is urged that the instruction is erroneous in that it fails to require the jury to find that ''the defective catcher arm did not receive the mail pouch in the usual and customary manner'' and that as a direct result thereof the plaintiff was struck and injured. It is said that the instruction fails to properly hypothesize facts demonstrating that the bent bar made the catcher arm so defective that it did not receive the mail pouch in the usual manner, and so the jury was permitted to speculate as to the defect causing the injury.

But, Mr. Dobbs said that when he made the catch at Strong City he found it difficult to get the catcher arm handle down and the catcher arm up in proper position, that the ends of the mail pouch came into the car, and he almost lost the mail pouch. It was then that he noticed, for the first time, that the horizontal bar across the doorway was bent downward two and a half or three inches. After Larson was injured all the postal clerks noticed the bent horizontal bar and estimated the bend to be two to eight inches. The first stop after Las Animas was La Junta, and there the railroad's car inspectors saw the bent bar, removed the catcher arm, and straightened the bar and so, indisputably, the horizontal bar was bent. The horizontal bar is fastened across the door in sockets and the catcher arm operates on the bar. In making a catch of mail a wooden handle inside the car is pushed downward, aiming and raising the arm into position to catch the suspended mail pouch. One of the car inspectors said that the bent bar would ''cause a tension in your bracket,'' and the postal clerks said that the bend caused the catcher arm ''to bind'' on the bar, necessitating greater pressure than usual to force the ▆▆ handle down and the arm out. The clerks described the defect, the result and the effect of the defect in different ways but to summarize, one clerk described the defect in the appliance as the bent horizontal bar which he said prevented the handle's moving up and down freely, it required

more exertion on the handle than normally. The effect of the defect in the bar on the oblique catcher arm was that it caused the arm to be pointed downward and lower than normally so that it did not strike and catch the mail pouch squarely. He said, "the arm that is used in catching the pouch would extend from the car at a greater tangent than it would if the catch arm was perfectly normal." The result was "that it would have a tendency not to cause the pouch to operate on that catcher arm in the proper manner. That was made in order to catch this pouch which is hung a certain distance from the car, and if this catcher arm hits the pouch at the proper place, or the pouch contacts this bar at the proper place, it will slip into this notch and stay there; while if this bar is not in its proper position, or in this case would be down along side of the car, or outward as it extends away from the car, it would naturally not have the opportunity to slide along this bar quite as easily as it would if it was in its proper position." This particular clerk examined the mail pouch after it was retrieved and the label holder on the top end of the pouch was bent, the inference being that the pouch had been caught or hit in an unusual position. There was also a small blood stain at the top of the pouch, the inference being that it got there as the pouch flapped into the car and struck Larson.

Plainly in these circumstances the jury could properly perform its function and, reasoning upon the evidence, draw the reasonably permissible inference, even though the pouch was eventually caught in the slot of the catcher arm, that it flapped into the car and struck the plaintiff which it would not have done had there been no bend in the bar and hence no defect in the appliance. In any event the testimony and reasonable inferences are not so contrary to the physical facts or so inherently improbable that there is no substantial probative evidence that the bent bar rendered the catcher arm appliance defective and was the cause of the plaintiff's injuries. And the railroad does not question its primary duty and liability in this case in any other respect or for any other reason than that the evidence that the bend in the bar rendered the appliance defective and caused the pouch to fly in the door, is contrary to the physical facts and inherently improbable because the pouch was caught. In this connection it must be remembered that the negligence relied upon and hypothesized in the instruction is failure to equip the car with a reasonably safe catcher arm, failure to properly inspect it and failure to repair or replace it after knowledge of the defect and, while the railroad's evidence tended to show that it had performed its duty and that the car and its appliances were repeatedly inspected in Kansas City, it does not question the sufficiency of the plaintiff's evidence as to its negligence in any of these essential respects, except for the reason indicated. Slater v. Atchison, T. & S. F. Ry. Co., 224 Mo. App. 824, 24 S. W. (2) 660; Willis v. Atchison, T. & S. F. Ry. Co., 352 Mo. 490,

350

178 S. W. (2) 341; Markley v. Kansas City So. Ry. Co., 338 Mo. 436, 441-442, 90 S. W. (2) 409, 411; 13 C. J. S., Sec. 699, p. 1309.

██ It is urged that instruction one is prejudicially erroneous in that it purports to cover the whole case and directs a verdict but "fails to require the jury to find that the defective catcher arm did not receive the mail pouch in the usual and customary manner, and as a direct result thereof plaintiff was struck and injured." The instruction hypothesizes the bent horizontal bar as constituting the defect in the catcher arm but, it is insisted, that the instruction should go further and require a finding as pleaded, of which the railroad says there was no evidence, that the catcher arm did not receive the mail pouch in the usual and customary manner. Ultimately the argument is that there is an insufficient factual basis in the instruction for the hypothesis of the defendant's liability. It is said that the instruction, in hypothesizing the bent bar, assumes ██ from the fact of the bend that the course and action of the pouch was unusual. What we have said with respect to the plaintiff's evidence and its sufficiency probably disposes of this argument. As indicated, the bent bar was the physical fact or condition rendering the appliance defective, while the negligence relied on as establishing liability was furnishing a defective appliance, failure to properly inspect and failure to replace or repair. The railroad did not offer any instructions covering the physical facts or details which tended to show that there was no defect which would expose the plaintiff to injury or that it had fulfilled its duty in these respects except instruction C which, like the plaintiff's instruction, said, "The court instructs the jury that even if you should find that the shaft of the mail pouch catcher was bent, still plaintiff cannot recover in this suit unless you also find that the bent shaft constituted negligence on the part of the defendant, as submitted in Instruction No. 1, and that said bent shaft directly caused plaintiff's injury, if any, and unless you find and believe from the evidence that the said bent shaft directly caused plaintiff's injury, then your verdict must be for the defendant." It is not necessary to analyze instruction one in detail and demonstrate that it is not prejudicially erroneous in the respects urged. It is sufficient to say that it contains all the essential elements necessary to a recovery and that it is not prejudicially erroneous for the reasons advanced upon this appeal. Slater v. Atchison, T. & S. F. Ry. Co., supra; Burch v. Cleveland, C., C. & St. L. Ry. Co., 328 Mo. 59, 72, 40 S. W. (2) 688; Stremming v. Holekamp Lumber Co., (Mo. App.) 238 S. W. (2) 31; Gately v. St. L.-S. F. Ry. Co., 332 Mo. 1, 56 S. W. (2) 54; Carson v. Evans, 351 Mo. 376, 173 S. W. (2) 30.

██ The plaintiff is an experienced mail clerk, familiar with the rules and regulations of both the government and the railroad, familiar with the duties and hazards of catching mail from fast moving trains and it is contended that he was guilty of contributory negli-

gence as a matter of law in two respects, first "that he had his whole right arm on the catcher arm handle clear up to his elbow when he made the pickup; that his right hip was only four inches away from his right elbow at this time; that when he was hit in the face he was looking out the door to see where the bags rolled that he had kicked off" and second, because he had "constructive notice" of the bend in the bar and therefore should have exercised greater care for his own safety. While the plaintiff admitted his familiarity with the rules and was aware of the hazards connected with catching mail pouches from a fast moving train. he did not admit that he was standing in the doorway too close to the catcher arm at the time the catch was made. He kicked two mail pouches off the train as he pushed down on the handle to make the catch and did look out and towards the door but he said that the arm was binding and he had to push as he did in order to exert sufficient pressure to raise the arm. The railroad does not claim that Larson's head was actually outside the door and the jury could find from his testimony and that of his witnesses that he was standing in the usual position and that he did not so deviate from the customary place of standing or method of operating the appliance that he was guilty of contributory negligence as a matter of law. At Newton Larson heard Dobbs say "watch the catcher arm, that it worked hard" and so it is argued that the condition complained of was open and obvious, that the plaintiff had as much knowledge of the defect and condition as the railroad and, not exercising greater care than he did, was guilty of contributory negligence. But, Larson had not inspected the appliance and, while he had whatever knowledge and notice Dobbs' warning conveyed, he testified that he was not aware of the bent horizontal bar and did not see it until the train arrived at La Junta. Larson did not knowingly erect or set up the device with defective parts (Mosely. v. Sum, 344 Mo. 969, 130 S. W. (2) 465) and the bent bar was not the permanent and open condition as obvious to business invitees as to owners. Paubel v. Hitz, 339 Mo. 274, 96 S. W. (2) 369. It may not be said here that the plaintiff received such a warning or had such knowledge that the railroad had discharged its obligation to him. Murray v. D'Oench Co., 347 Mo. 365, 147 S. W. (2) 623. "Nor does the evidence show, as a matter of law, that plaintiff's injuries were the proximate result of his own carelessness and negligence in exposing himself to known and appreciated danger. The risk of bodily harm which plaintiff took in trying to prevent injury to the bundle of sheet rock (being unloaded from a truck) was not so glaring and obvious as to make his act, as a matter of law, either the sole proximate cause of his injury, or a contributory cause thereof. Rather, the issue was for the jury who might reasonably find that plaintiff's act was the normal response that a reasonably prudent person would exhibit under the circumstances, and such as should reasonably have been

anticipated by the defendant's agent at the time. Clearly, the issues of negligence and proximate cause were for the jury." Stremming v. Holekamp Lumber Co., 238 S. W. (2), l.c. 35; Slater v. Atchison, T. & S. F. Ry. Co., 224 Mo. App., l.c. 830-833, 24 S. W. (2), l.c. 664-665.

To compensate the plaintiff for his negligently inflicted injuries the jury returned a verdict for $15,000. The trial court, upon motion for a new trial, required a remittitur of $5000, which the plaintiff accepted, and final judgment was entered for $10,000. The railroad contends that the final judgment is excessive and should be reduced by further remittitur. The amount of damages for personal injuries is primarily the jury's function and prerogative, and upon appeal, after a remittitur this court pays deference to the trial court's action in seriously considering and passing upon the excessiveness or inadequacy of verdicts (Lindsey v. Williams, (No. 43,236) 260 S. W. (2) 472) and is reluctant to disturb the judgment or require a further remittitur. Mooney v. Terminal R. R. Ass'n., 353 Mo. 1080, 1092, 186 S. W. (2) 450, 455; Schaefer v. Transamerican Freight Lines, (Mo.) 173 S. W. (2) 20, 24-25. Nevertheless, each case must stand upon its particular facts and when the circumstances plainly demand it, this court often requires a further remittitur. Lange v. St. Louis Public Serv. Co., 361 Mo. 74, 233 S. W. (2) 641; Russell v. St. Louis Public Serv. Co., (Mo.) 251 S. W. (2) 595. Admittedly, there is no precise formula by which it may be determined whether and how much a verdict is excessive, and despite the difficulties inherent in the problem, especially on appeal, each case is necessarily dependent on its own particular merits. The nature, extent and permanency of the injuries are the paramount factors. Consideration is given to changing economic factors (annotation 12 A. L. R. (2) 611), and the compensation awarded and approved in cases of similar or fairly comparable injuries. Ford v. L. & N. R. Co., 355 Mo. 362, 196 S. W. (2) 163; Joice v. M.-K.-T. R. Co., 354 Mo. 439, 453-454, 189 S. W. (2) 568, 576-577; Russell v. St. Louis Public Serv. Co., supra. From this court's viewpoint the problem is largely one of the substantiality and probative force of the evidence, for if there is substantial evidence, particularly with respect to serious and permanent injury, the trial court's action in requiring a remittitur may not be disturbed. Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 1150-1151, 238 S. W. (2) 674, 681-682. The evidence is viewed most favorably to the plaintiff, nevertheless, as it is with other factual questions, the evidence and fairly permissible inferences must be substantial and probative of the claimed serious injuries and permanent disabilities, and may not be found or approved upon inherently improbable evidence or mere speculation. Williams v. Illinois C. R. Co., 360 Mo. 501, 511, 229 S. W. (2) 1, 6.

In describing his injuries, treatment and disabilities Mr. Larson said, "I felt something fly in and hit me in the face, and about the

same time something hit me on the top of the head and I got this gash in the forehead. I felt like my whole stomach was coming up. I staggered back and somebody caught me and I got down on the table like this (indicating) and when I came to they had me lying on the sacks and they were wiping the blood off my face." When asked how he felt at that time he said, "Like a boiled owl, bloody and bruised all over." ■ He was wearing goggles and they were broken. At La Junta he saw Dr. Sisson who "cleaned up the wounds and stitched my head" and advised an ice pack for the swelling in his face. He returned to Kansas City on the next train and there saw Dr. McAlester, an eye specialist. His left eye was swollen and blood-shot and he had pain in his forehead. Dr. McAlester saw him three or four times and he says "shot a needle with dope of some kind to ease the pain." Dr. Feierabend saw him five times because of the pain in his head, and he gave him the same thing that Dr. Sisson had at La Junta, pills "but I don't know what they were, but they did kill the pain." As to his present complaints and disabilities Mr. Larson said, "The head injury and a nervous situation of some kind." He says that he has headaches when he wakes up and when he goes to bed, his head aches more or less all the time and he has pain down "this cord in that shoulder" and both he and Mrs. Larson say that his memory is not as good as formerly.

Dr. Sisson of La Junta, plaintiff's witness, said that he met Larson at his office. In describing Larson's injuries and his treatment he said, "He appeared to be a conscious male, in no serious distress, but there were apparent some injuries about his head. * * * My record shows that he had a laceration on his forehead and an abrasion on the base of his nose and on the right side of his head and he also had subconjunctival hemorrhages in both eyes." Subconjunctival hemorrhages are "more than bloodshot; it is an accumulation of blood." The laceration on Larson's forehead was about a half an inch long through both layers of the skin and he "put a stitch in it; that laceration." Dr. Sisson said that there was no evidence of a fracture or of a concussion and he did not appear to be dazed.

Dr. McAlester was not called as a witness but the plaintiff did call Dr. Feierabend, an industrial surgeon. He first saw Mr. Larson on January 26th, six days after the injury, and thereafter saw him four times; each time in the doctor's office. Dr. Feierabend had X rays taken by Dr. Lockwood and they were negative. He said, upon examination, "I concluded that he had an abrasion of the right side of the forehead, a cerebral concussion, and an injury to the facets of the joints in the neck around the cervical vertebrae just back of the place where the nerve roots come out, and the irritation here was producing a pain that radiated up into his forehead. Those are the three things I found wrong with him. * * * I said he was doing okay, and I dismissed him" and recommended that he see a neuro-surgeon.

354

Up to this point it will be noted that the plaintiff's evidence is not demonstrative of serious, permanent injury and to establish the fact the plaintiff called a specialist, "a neurologist and psychiatrist." This witness saw the plaintiff twice; "I made my ·first examination on the 16th of this month (June 16, 1952—his trial began on June 23rd, 1952) at my office, and I saw him the second time last Saturday." His examination was confined to the field of his specialty. He tested the "motor power" in his arms and legs and he "found no true paralysis in any of the extremities, but he shows some trouble in coordination on the left side." He gave the Rhomberg test and the plaintiff swayed far more than normal, he tested his reflexes and "They were a little increased, moderately increased; about the same on both sides in all extremities." He said that the latter test "indicates some disease or some injury to the central nervous system." He examined sensation and said, "I found no pathological sensation; but in questioning him, there is a slowness of mental functions, a memory defect. He is uncertain as to his memory." He found tremor in the outstretched fingers and tongue, also indicative of injury or disease to the central nervous system. It was his opinion that the blow on the right side of the face and head "produced a concussion of the brain and some minute tissue changes, possibly here and there minute hemorrhages, especially in the right cerebrum and right central ganglia of the brain." It was his opinion that Mr. Larson had sustained an injury to "the right cerebrum over in this region (indicating), in the ▇▇▇ frontal and parietal regions of the brain, and deep down in the midst of the brain they call the central ganglia," and that the condition was permanent. It was also his opinion, in answer to the hypothetical question, that Larson's "troubles from which he is suffering now, both subjective and objective, are the result of that injury."

At first blush, as the plaintiff urges, it would appear that this testimony is indicative of serious permanent injuries warranting the award and approval of substantial compensatory damages. But, allowing full force to the testimony, what are Mr. Larson's "troubles" and what is "the result of that injury"? The doctor finds and describes the injuries and they are permanent, according to him, but he does not say what effect they have or what the result to the plaintiff is except that his present "troubles" are attributable to the injuries. He does not point to or demonstrate a single tangible disability or disabling effect, and his testimony is not corroborative of any claimed disabling injuries and in this regard his evidence is indeed lacking in compelling, convincing force. The cases upon which the plaintiff relies illustrate precisely the difficulty involved in giving this evidence the full force and complete credence advocated by his counsel. For example, in Gilchrist v. Kansas City Rys. Co., (Mo.) 254 S. W. 161, the plaintiff fell and was unconscious and remained

unconscious for five days. There was a large scalp wound and injury over the mastoid process resulting in abscess. There were five broken ribs with the pleura lacerated, followed by a thickening of tissues which interfered with breathing and caused pain. There was a left foot drop with the reflexes paralyzed indicating injury to the brain. There was some incontinence and the plaintiff's sense of taste and smell were impaired and his eyes so affected that he was required to wear glasses. The plaintiff was irrational for two weeks, and at the time of trial suffered from severe headaches and dizziness. All these injuries indicated a brain injury. In Conrad v. B. & O. R. Co., 345 Mo. 335, 133 S. W. (2) 350, there was a loss of $6500 in wages, there was a hole in the plaintiff's head, his speech was affected, there was a fifty per cent loss of hearing, numbness in the legs and severe headaches. In Timmerman v. Terminal R. R. Ass'n., (Mo.) 241 S. W. (2) 477, one expert saw the plaintiff six months after the accident but he saw and examined him four or five times. Another expert saw the plaintiff a year and a half after the accident but he saw him four or five times and further specific medical treatment was recommended. X rays showed bone degeneration of the sixth cervical vertebra which was permanent and the plaintiff suffered post-traumatic neurosis manifested by anxiety, depression and headaches. The doctor whose testimony is involved in this appeal was a witness in Rush v. Thompson, 356 Mo. 568, 202 S. W. (2) 800, but there the plaintiff was in a hospital for three weeks, and in addition to the injuries found and described there was demonstrable disability from the plaintiff's inability to work after repeated attempts. It is difficult to conceive of a serious brain injury without some demonstrable, tangible effect or result to a man fifty-three years of age, other than headaches, a slowing down in his work and diminishing memory.

In this case the plaintiff's sole claim of injury and disability is repeated headaches and nervous condition manifested by the fact that his memory is not as good as it once was. There is no medical or hospital expense and there was the minimum of medical treatment and none indicated or recommended in the future. This man has never been in a hospital or a clinic. He was injured on the 20th day of January 1951 and returned to his usual work at the regular pay on the 12th day of February 1951 and so far as appears from this record has not missed a day's work since. Except for the first three weeks there has been no loss of wages and no diminished income or earning capacity. Considering the rules indicated and all the factors employed in passing upon the excessiveness of verdicts, including the possibility of error on the part of this court, this verdict is yet excessive in the sum of $4000. McBride v. Clarida, (Mo. App.) 254 S. W. (2) 36; Harvey v. Gardner, ▮▮▮ 359 Mo. 730, 223 S. W. (2) 428; Baker v. Kansas City Ter. Ry. Co., (Mo.) 250 S. W. (2) 999. If; therefore, the plaintiff will enter a remittitur in the sum of $4000, within fifteen days, the

judgment will stand affirmed in the sum of $6000, as of the date of the judgment, otherwise the judgment will be reversed and the cause remanded for a new trial. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. *Ellison, J.,* and *Leedy, P. J.,* concur; *Tipton, J.,* dissents for the reason he thinks the amount of the remittitur is excessive.