Roy HONEYCUTT, Respondent,

v.

**WABASH RAILROAD COMPANY, a Corporation, Appellant.**

No. 47600.

Supreme Court of Missouri,

Division No. 2.

July 11, 1960.

Ely & Voorhees, Fordyce, Mayne, Hartman, Renard & Stribling, Alphonso H. Voorhees, St. Louis, for appellant John L. Davidson, Jr., St. Louis, of counsel.

Charles E. Gray, Gray & Jeans, St. Louis, for respondent.

ELMO B. HUNTER, Special Judge.

This is an appeal from a judgment for $20,000, the sole contention being that it is excessive by more than $7,500.

Repondent-plaintiff, Roy Honeycutt, on July 18, 1955, brought this action against appellant-defendant, Wabash Railroad Company, a corporation, under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for personal injuries sustained by him on November 10, 1954, when he was injured by the discharge of a rivet gun operated by air pressure, allegedly as a result of the negligence of defendant in providing plaintiff with a rivet gun which had an unprotected and overly sensitive trigger.

The case has an interesting history. It was first tried in the Circuit Court of the City of St. Louis on April 2, 1956. This trial resulted in a verdict for plaintiff for $11,500. The trial court ordered a remittitur of $7,000 and judgment was subsequently entered for plaintiff for $4,500 from which judgment defendant appealed to the St. Louis Court of Appeals. That court reversed the judgment outright. See, Honeycutt v. Wabash Railroad Co., Mo. App., 303 S.W.2d 153. Eventually, the case reached the United States Supreme Court which reversed the decision of the St. Louis Court of Appeals and returned the case to that court. See, Honeycutt v. Wabash Railroad Co., 355 U.S. 424, 78 S.Ct. 393, 2 L.Ed. 2d 380. The St. Louis Court of Appeals in an additional hearing on the case held there was error in the damage instruction, and remanded the case to the circuit court for a new trial on the issue of damages alone. See, Honeycutt v. Wabash Railroad Co., Mo.App., 313 S.W.2d 214.

The second trial of this case in the Circuit Court of the City of St. Louis resulted on January 14, 1959, in a verdict in favor of plaintiff in the sum of $20,000. The trial court entered judgment accordingly. After an unavailing motion for new

trial this appeal, with its sole question of excessiveness, was perfected.

■ In reviewing the jury's findings on a contention of excessiveness of the verdict it is the duty of the appellate court to consider the evidence of damages in the light most favorable to the plaintiff. In so doing we acknowledge that the amount of damages is primarily for the jury. It is that body which is charged with the function of finding, as a fact, what sum will fairly and reasonably compensate plaintiff for his injuries.

■ An appellate court properly may determine, as a matter of law, the maximum amount which the evidence will support. Admittedly, such question is not susceptible of determination by precise formula or with mathematical nicety. Consideration must be given to the nature and extent of the injuries and disabilities, diminished earning capacity, if any, changing economic factors and the compensation awarded and approved in cases of similar or fairly comparable injuries, if any. In making the latter comparison, we must in the process keep in mind that each case is to be carefully considered on its own facts and that both injuries and injured individuals are not susceptible of being treated as though exactly like some other, if individual justice is to be done in each separate case.

We proceed to set out the evidence concerning plaintiff's injuries viewed in a light most favorable to him.

On the morning of November 10, 1954, plaintiff, a thirty-five year old employee of defendant, while driving rivets under a railroad car, picked up his rivet gun which unexpectedly went off ejecting a metal snap which hit the side of the railroad car and bounced back hitting him a severe and cutting blow just above his left eye. The impact broke both his regular glasses and his safety glasses. Blood was running down the side of his face. His superior, Mr. Farris, took him to Dr. Withrow, defendant's company doctor at North Kan-

sas City. Dr. Withrow sewed up the cut with two or four stitches and sent him home. The next day he returned to work but didn't do anything. Two days after the accident he returned to Dr. Withrow, and returned to the doctor again in two or three days. These visits were in the mornings before plaintiff went to work. Each time the doctor changed the bandage, looked at the cut and cleaned it off. Other than giving plaintiff prescription medicine for his headache this is all Dr. Withrow did for him. He told plaintiff that bufferin, aspirin or anacin would do about as good as the prescription tablets. The area around plaintiff's left eye remained swollen and black for about five days. It remained bloodshot for several months continuously.

Dr. Withrow then sent plaintiff to Dr. McCloud, the company doctor in Kansas City, who examined his eyes and gave him another pair of glasses. At that time his left eye was burning, swollen and bloodshot. His eye would get all bloodshot, pain would follow, and in about three or four hours after that pain it would start throbbing on the left side just like a toothache. Sometimes it would last eight hours. He would endeavor to "sleep it off and maybe the next day it'd still be there." His eye would be puffed up and bloodshot.

Two or three weeks after the accident Dr. Withrow sent him to Decatur, Illinois, to the hospital for examination, where he arrived on December 6, 1954, and was discharged on December 7, 1954. He was off work a full week for the Decatur trip. His left eye still burned, would be bloodshot and he couldn't read. If he started reading it would start burning, "stuff" would come out of it, and the throbbing pains would commence. Prior to the accident he had never had any trouble reading or watching television. After the accident if he watched television in less than thirty minutes the burning and pain process would start. He couldn't read the newspaper—or glance through it without the eye burning and pain and headaches beginning.

The company eye doctor at Decatur looked at his eye and advised him that Dr. Withrow could do as much for him as the doctors at Decatur.

After returning to Kansas City from Decatur plaintiff went back to Dr. Withrow until April, 1955, during which time Dr. Withrow gave him aspirin, anacin or bufferin. Dr. Withrow said he didn't know what to do for him and told him, "There's something up there causing your headaches but I don't know what it is. The only thing I can tell you is just take bufferins and aspirins."

During all this time he continued to work daily. When he would go home at nights he would have the headaches and just lay around or go to bed after supper. He would have these headaches three to five times a week. Because of his headaches he gave up numerous activities such as playing ball with his boys. Scout work, running, much of the work around the house such as mowing the yard, and even playing pinochle with his wife and friends for that would start the burning process. Eventually, he moved to a smaller house and yard. He changed jobs in that with the aid of his seniority with defendant he bid in a truck job "because there's a lot less stoopin' over and raisin' up." His new job consisted primarily of driving a truck part of the time in order to get to where the particular car that needed repair was located and then to do carman work on the car. He continued to work some around dirt and cinders as his work requires that.

In April, 1955, his attorney sent him to Dr. Steegmann in Kansas City, who gave him some tablets for his headaches, but they made him so sleepy he didn't continue to take them. His attorney also sent him to another doctor for examination but he wasn't advised of its results.

On November 29, 1955, plaintiff returned to Dr. Steegmann for additional examination. On plaintiff's earlier visit to Dr. Steegmann on April 13, 1955, he had com-

plained of his left eye and the region around it and of its throbbing pain and burning. Plaintiff had reported this as being relatively constant up to January, 1955, after which it became intermittent—lasting for most of one day or a shorter period and varying not only in duration but also in intensity. On the November 29th visit plaintiff complained he still had these throbbing headaches, after which the eye would become congested. Dr. Steegmann attributed the headaches which he deemed similar to migraine headaches to the blow on the head received in the accident. He noted the headaches and eye congestion had been aggravated by warm weather.

On December 5, 1955, plaintiff went to St. Louis where he was examined by Dr. Ernest H. Parsons. Plaintiff's complaints were of headaches, and pains in his left eye; that his eye burned and if he read it got bloodshot, together with a certain amount of increase in secretion in the left eye. His physical examination showed a well healed generally horizontal scar of slightly less than one inch in length just above the left eye and just beneath the eyebrow. His neurological examination related to the skin above the left eye and disclosed "a loss of abnormality of sensation above the left eye, involving the left eyebrow. It demarcated exactly the part of the skin which is supplied by the nerve which comes out above the eyebrow and goes to the forehead, the anterior third of the scalp." The area had a peculiar sensation to the patient and was abnormally decreased in sensation. It was marked out identically upon repeated testing with a wheel with pins on it, and there was a decrease in the skin temperature over this area observed by examination with a thermocouple. Also, there was an increase in the tearing of the left eye. It was watering quite markedly in contrast with the right eye. When Dr. Parsons touched a wisp of cotton to the cornea on the left side and on the right side, there was an immediate wink of the particular touched eye. Dr. Parsons recommended that plaintiff

take shots of Vitamin B-12, and on his return to Kansas City plaintiff took these shots for twenty days at the company doctor's office.

In September, 1958, plaintiff went to Dr. Boone in St. Louis because his eye was "swelled shut." He advised Dr. Boone about his eye and his headaches. Dr. Boone gave him a prescription for thirty-six tablets for pain which he used and had refilled three times. He was directed to take them every six hours as needed. Plaintiff would try to wait until he got home at night from work to take them. Although he carried them to work he would use anacins and bufferins there and take the prescription tablets as little as possible. These pain tablets relieved him "a little bit * * * but don't cure it. * * * I usually go to bed." About that time he also went to Dr. Parker, a company eye doctor, who changed the prescription on his glasses, and turned him over to Dr. Scheretz. "That's when my eye was all a-matter'n up at night and swelled up and bloodshot and then when it was stickin' together." Dr. Scheretz gave him some salve to put on his eye at night.

On October 2, 1958, plaintiff returned to St. Louis for an additional examination by Dr. Parsons. His complaints were about the same as on his original visit to Dr. Parsons except that plaintiff felt he was worse. According to Dr. Parsons, "he had the same things but he felt that they were worse than they had been previously." Dr. Parsons' examination showed more than he had found on his December 5, 1955, examination of plaintiff. The desensitized area which was present in December, 1955, was that limited directly to the area immediately above the scar in the left eyebrow. The October 2nd examination showed that the area where there is decreased sensation had increased substantially. As the doctor expressed it, "The degeneration having increased the process * * * is a great deal more serious" than at the time of the earlier examina-

tion. There continued to be a slight puffiness of the left eyelid. The significant change as measured by a neuro-dermometer was not only a sharp decrease in skin temperature but also an increase in skin resistance over the major portion of the ophthalmic division of the left trigeminal nerve, and there was at this time an absence of the corneal reflex on the left side. The patient no longer blinked when touched in the left eye with a wisp of cotton, whereas he did in the right eye.

Based on this examination, Dr. Parsons testified at the trial that plaintiff was then and is suffering from a post-traumatic trigeminal neuritis involving the opthalmic division of the trigeminal nerve on the left side; that the loss of the corneal reflex on the left side represents a retrograde degeneration or deterioration of the process which began with the injury at the supra-orbital portion of the ophthalmic branch of the fifth nerve on the left side which has deteriorated back going down toward the brain in a well established manner called Wallerian degeneration. This means that when there is an injury to a nerve, there is a degeneration back toward the cell body a certain distance, "and that certain distance in this nerve is sufficient to get it back to the cell body which is in the semilunar or gasserian ganglion; inside of the head really." There is a damaged permanently gone nerve which supplies pretty much the upper third of the face and the anterior third of the scalp on the left side, together with the eye on the left side. He was asked, "Q. Do you have an opinion as to whether there will be further degeneration of that nerve? A. I don't know. There can be, and it can stop at this point; I could not state. Q. Is there any way that you can tell? A. Only by the passage of time and repeated examination. I have seen them go more; I've seen them stop at this point."

Dr. Parsons gave it as his opinion that plaintiff's eye is inflamed because as a part of this injury and the resulting process there is a loss of the sensation over the cornea of the eye. This results in the person not being aware when dirt or foreign bodies get into the eye. There is no blink reflex. There is nothing to tell the body to secrete tears and bat the eyelid. A chronic irritation or a chronic low grade infection results. The increase in secretions is due to the same process. Since this nerve controls the glands of lacrimation, when it is not working, as here, then the stimulators of the lacrimal gland work overtime. According to Dr. Parsons that is why he has the secretions which mat his eyes together.

"* * * it is a chronically low grade infected eye which is, obviously, a dangerous eye.

"Q. In what way, Doctor? A. The infection which is rather constantly being gotten there—because we are constantly getting dirt of all sizes in our eyes—is not taken care of, not appropriately handled, not blinked out, and an injury to the eye with scar, an injury—infection, with the loss of the eye is almost to be expected. * * *

"Q. * * * once this nerve has been damaged and has started degenerating, is there any reverse process which it builds itself back up, or is that gone forever? A. In this case, being almost four years after the injury, this is a permanent irreversible process."

Dr. Parsons felt plaintiff "cannot" (ought not) work where he is going to have his eye exposed to dirt and foreign material to further injure it, and he "cannot" (ought not) work where he is going to be exposed to glare or lights or the like or where he is going to be exposed to chilling on the head or face. If he does, "he could lose his eye." His vision is fatigued. Excessive use would cause chronic irritation.

On December 2, 1958, plaintiff was examined in a St. Louis hospital by Dr. Jacques Paul Schaerer, a consulting neurosurgeon,

who performed an angiogram on him in order to be sure there was no abnormality or weak spot, such an aneurysm, in a blood vessel in the brain. The angiogram was normal. Plaintiff told Dr. Schaerer that as of lately his headaches have been getting worse and aspirin does not relieve the pain; that he has had "frequent episodes where his left eye becomes red with a purulent puslike discharge." Dr. Schaerer's neurological examination revealed a diminished sensation to pin prick in the area of the first branch of the trigeminal nerve on the left side—the area of the forehead and the eye and that there was also a diminished sensation over the cornea of the left eye. He gave as his opinion that the injury from the rivet gun episode was the cause of his findings; that there are implications—"if you touched the cornea with something, the defense mechanism doesn't work right. That means that whenever a tiny foreign body, maybe from the air, would reach—come into his eye, his defense mechanism doesn't work, and this body will remain there and begin to fester, and this is the reason why he has there episodes of redness with puralin [sic] discharge—pus discharge from his eye. Then when this happens the eye gets inflamed by—on the basis of reflexes again, the headaches start, and irritation in the area of the eye will set up nasal irritation and the blood vessels become more crowded with blood there in the neighborhood and this is the process which causes the person to have pain, only much like migraine pain. * * * Q. Can that in itself do any damage to the eye? A. Not if it's properly taken care of; * * * each time one of those episodes of redness and puralin [sic] discharge occur, he will have to apply eye drops containing antibiotics, for instance. He may have to go see a doctor to wash out the eye." He stated the germs might build up immunity to the antibiotics.

On January 6, 1959, as his final examination before the second trial, plaintiff was examined by two doctors at defendant's request.

At the trial plaintiff adduced evidence of all the foregoing and additionally testified that as of the trial date after a day's work he usually would go home with a throbbing headache. This still occurs three to five times a week. He still has the numb area on his face, and his eye and head condition are not improved but, if anything, are somewhat worsened. He still gets the throbbing head and eye pain when he bends over and raises up. His prior complaints are still present. He hasn't gone to doctors more because "most of them just told me they couldn't do nothing for me."

In contending that the $20,000 verdict is excessive defendant relies heavily on the fact as disclosed by the evidence that (1) since the accident plaintiff has not missed a day's work because of his accident other than about twenty-two days used in going to the various doctors primarily for medical examination; (2) plaintiff's loss of wages and out of pocket expense as a result of his injury are minimal, totaling approximately $573; (3) plaintiff is not disabled from working and (4) had astigmatism before this accident which with the correction afforded by his eye glasses gave him 20–20 vision and he still has that 20–20 vision.

Defendant in its brief frankly states that it is impossible to find another case with identical facts and circumstances but cites the following cases as "suggestive": Morris v. Alexander, Mo.App., 275 S.W.2d 373; Roberts v. Carter, Mo.App., 234 S.W.2d 324; Larson v. Atchison, T. & S. F. Ry. Co., 364 Mo. 344, 261 S.W.2d 111, and Karnes v. Ace Cab Co., Mo.App., 287 S.W. 2d 378. Plaintiff in his brief likewise acknowledges there is no closely comparable case and cites Caspermeyer v. Florsheim Shoe Store Co., Mo.App., 313 S.W.2d 198, and Roderick v. St. Louis Southwestern Ry. Co., Mo., 299 S.W.2d 422, as possibly rewarding. We have read these cases and many more. None are particularly helpful in view of the facts before us. None contain closely comparable injuries. Several are in awarding amounts of $20,000 but with totally different injuries that bear

**56**

difficult comparison. See, Parlow v. Carson-Union-May-Stern Company, Mo., 310 S.W.2d 877; Kiger v. Terminal Railroad Association of St. Louis, Mo., 311 S.W.2d 5.

As an appellate court in considering the question of excessiveness of the verdict, we must be mindful not to impinge on the fact finding function of the jury. As previously stated it is our duty, on a proper record, to determine as a matter of law the maximum amount which the evidence will support. Under the uniformity rule we obtain what aid we can from examination of the cases involving similar or fairly comparable injuries giving due consideration to any differences and certainly to the changes in economic conditions, living costs and the purchasing power of the dollar since the time the particular verdict was rendered.

■ Without endeavoring to fully summarize plaintiff's injuries, we have presented the picture of a young man, age thirty-five when injured, who for over four years has suffered from three to five times a week excruciatingly painful headaches of duration of from a few hours to as many as twenty-four hours. This condition is said to be permanent. He no longer can read newspapers or view television and engage in similar activities without occasioning these headaches and eye pain. He no longer can bend or stoop and raise up, as formerly, without triggering these vascular type headaches. To avoid triggering them he has had to forego such ordinary but fundamental pleasures as playing ball with his boys, joining with them in scout activities and playing pinochle with his wife and their mutual friends. Since his injuries are permanent these things so dear to most of mankind are permanently to be foregone. The day's end finds him frequently with these headaches with going to bed the indicated step. This is his future pattern in view of the permanency of his injury. His eye condition with all of its limitations and problems is likewise permanent. He must live with it all the rest of his life.

The jury has made its findings. The trial court has overruled defendant's motion for a new trial containing the contention that the verdict is excessive. We have reviewed the evidence to see whether the evidence, viewed in the light most favorable to the judgment, affords reasonable and substantial support for that judgment on whether, as a matter of law, it is excessive. As a result of our consideration we have concluded that the judgment should stand affirmed in its full amount.

The judgment of the circuit court is, accordingly, affirmed.

LEEDY, P. J., and EAGER and STORCKMAN, JJ., concur.